FILED

2015 JUL -7 AM 10: 40

CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| IN RE: | : | CASE NO. 14-21261 (AMN) |
| CHARLIE SMITH | : | CHAPTER 7 |
| DEBTOR. | : | JULY 6, 2015 |

|  |  |  |
|---|---|---|
| PACIFIC INS. CO., LTD A SUBSIDIARY OF THE HARTFORD FINANCIAL SERVICES GROUP a/s/o PETER PAN BUS LINES TRUST | : : : : | AP No. 14-02046 (AMN) |
| V. | : : | |
| CHARLIE SMITH | : | JULY 6, 2015 |

## OBJECTION TO PLAINTIFF'S MOTION TO COMPEL TESTIMONY AND PRODUCTION OF DOCUMENTS FROM T.J. MORELLI-WOLFE AND THE LAW OFFICE OF T.J. MORELLI-WOLFE, P.C., AND FOR CONTEMPT

Attorney T.J. Morelli-Wolfe (hereinafter referred to as Attorney Morelli-Wolfe) by and through his counsel Winget, Spadafora, & Schwartzberg, LLP hereby files this Objection to the Plaintiff, Pacific Ins. Co., Ltd., a subsidiary of The Hartford Financial Services Group a/s/o Peter Bus Lines Trust's Motion to Compel Testimony and Production of Documents and for Contempt. (hereinafter "Motion to Compel.") *See* Doc. 19. Pursuant to Federal Rule 26(c) of the Federal Rules of Civil Procedure Attorney Morelli-Wolfe moves for a protective order regarding his testimony and production of documents. Additionally, Attorney Morelli-Wolfe objects to the Plaintiff's request of contempt as Attorney Morelli-Wolfe did not inappropriately withhold discovery or attempt to interfere with Defendant Smith regarding his alleged waiver of the attorney-client privilege.

As further discussed below Attorney Morelli-Wolfe is barred by the attorney-client

privilege and work product doctrine from testifying regarding certain aspects of his representation of the Defendant Charlie Smith (hereinafter "Defendant Smith") and producing certain documents as Defendant Smith did not waive the attorney-client privilege and Defendant Smith further submitted an affidavit specifically disclaiming any waiver of the attorney-client privilege. *See* Affidavit dated April 15, 2015 attached hereto as "Exhibit A." Accordingly, as Defendant Smith did not unequivocally waive the attorney-client privilege, which Defendant Smith and only Defendant Smith can waive, Attorney Morelli-Wolfe has taken the proper steps to ensure that the asserted privilege remains intact. The Court should deny Plaintiff's Motion to Compel Testimony and the Production of Documents and for Contempt.

## I.    Background

This matter arises out of the Plaintiff's claim that Defendant Smith failed to properly identify the nature and amount of Plaintiff's claims in his Chapter 7 bankruptcy petition and at the 341 meeting. *See generally* Complaint Objecting to Discharge, Doc.1. The Plaintiff alleges that it paid Defendant Smith workers' compensation benefits in excess of $60,000.00. *Id.* at p. 1. Defendant Smith brought a claim against the tortfeasor and settled such claim for $100,000. Defendant Smith was represented by Attorney Morelli-Wolfe in his action against the tortfeasor. The Plaintiff alleges it had a lien against the afore-mentioned settlement, but Defendant Smith allegedly "disregarded" that lien. The Plaintiff brought suit against Defendant Smith relative to the lien and obtained a judgment against Defendant Smith before the bankruptcy petition was filed. *See* Motion to Compel, at p.1. The Plaintiff also claims that Defendant Smith failed to properly identify his potential claim against Attorney Morelli-Wolfe who represented Defendant Smith in the tort claim. *Id.* at p. 2. The Plaintiff alleges that these actions render Defendant Smith ineligible for discharge pursuant to 11 U.S.C. §§ 727(a)(4)(A) & (a)(5). These actions further render

2

Defendant Smith's debt to Pacific nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) & (a)(4).*See* Doc.1.

The Plaintiff served a Subpoena *duces tecum* upon the Law Office of T.J. Morelli-Wolfe, P.C. and additionally served a subpoena compelling the testimony of Attorney Morelli-Wolfe. Attorney Morelli-Wolfe attended his deposition on February 5, 2015 and numerous times throughout his deposition asserted the attorney-client privilege in response to questions that involved his representation of Defendant Smith. Defendant Smith was not present at the deposition and never informed Attorney Morelli-Wolfe that he waived the attorney-client privilege.

On April 15, 2015 after the deposition the Plaintiff wrote an email to Attorney Morelli-Wolfe inquiring about the status of the responsive documents to the subpoena. *See* Doc. 19-1 at p. 2. Attorney Morelli-Wolfe responded stating that he had met with Defendant Smith the previous day, Defendant Smith had not fully understood what waiver of the attorney-client privilege meant and indicated that any such waiver was a mistake and he did not waive the attorney-client privilege. *See* "Exhibit A." Moreover, included with the correspondence was an affidavit executed by Defendant Smith which affirmed in part that he does "**not**" waive the attorney-client privilege with respect to [his] conversations with Attorney T.J. Morelli-Wolfe or the contents of [Defendant Smith's] file with [Attorney Morelli-Wolfe-Wolfe's] office. (emphasis in the original) *See* "Exhibit A."

## II.   **Standard of Law**

Federal Rule of Civil Procedure 26(c) provides that any person from whom discovery is sought may move for a protective order. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. The court has "substantial latitude to fashion protective orders." *Seattle Times Co. v. Rhinehart*, 467

3

U.S. 20, 36, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). *DaCosta v. City of Danbury*, 298 F.R.D. 37, 38 (D. Conn. 2014)

"The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S. Ct. 2081, 141 L. Ed. 2d 379 (1998). "The attorney-client privilege prevents testimonial disclosure, discovery, or seizure by subpoena of confidential communications between an attorney and his client, unless the client waives the privilege. (emphasis added). *United States v. Barth*, 1992 U.S. Dist. LEXIS 18414, *28 (D. Conn. July 9, 1992) *citing Lilly, An Introduction to the Law of Evidence*, 2d, § 9.6.[1] The privilege exists to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). Because the attorney-client privilege plays such a critical role in the administration of justice, "rules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution." *In re County of Erie*, 546 F.3d 222, 228 (2d Cir. 2008).

As a general matter, "[c]ourts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense. . . ." (citation omitted) *Morande Auto. Group, Inc. v. Metro. Group, Inc.*, 2009 U.S. Dist. LEXIS 19804, *8-9 (D. Conn. Mar. 12, 2009). The party asserting either attorney-client privilege or work-product protection bears the burden of proving all essential elements of the privilege or protection. *In re Horowitz*, 482 F.2d 72, 82 (2d Cir. 1973).

---

[1] All unreported cases are attached hereto as "Exhibit B."

"To determine whether an inadvertent disclosure waived the attorney-client privilege, courts in Connecticut and the Second Circuit balance the following factors: (1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery and the extent of the inadvertent disclosure; and (4) overreaching issues of fairness." *Harp v. King*, 266 Conn. 747, 768-69, 835 A.2d 953 (2003); *Expert Choice, Inc. v. Gartner, Inc.*, 2007 U.S. Dist. LEXIS 21208, *9-10 (D. Conn. Mar. 27, 2007).

"Although it also seeks protection of the relationship between attorney and client, the work product doctrine, expressed in its modern form in the seminal case of *Hickman v. Taylor*, 329 U.S. 495, 91 L. Ed. 451, 67 S. Ct. 385 (1947), covers more than the confidences of clients communicating with their attorneys." *In re Sealed Case*, 219 U.S. App. D.C. 195, 676 F.2d 793, 808-09 (D.C.Cir. 1982) (J. Skelly Wright, J.) "Indeed, the protections of the work product doctrine extend, at least potentially, to a whole complex of interests, ranging "from clients' interests in obtaining good legal advice . . . . to the interests of attorneys in their own intellectual product. At its heart the doctrine protects both attorney and client from opposing counsel's "indirect attempt[s] to ascertain the manner in which an adversary is preparing for trial." (citation omitted) *Clute v. Davenport Co.*, 118 F.R.D. 312, 315 (D. Conn. 1988).

## III. Legal Argument

### a. A Protective Order should be granted as Attorney Morelli-Wolfe already appeared for a deposition and properly asserted the attorney-client privilege.

Attorney Morelli-Wolfe appeared for and attended his deposition on February 5, 2015. Throughout that deposition Plaintiff's counsel asked various questions that delved into Attorney Morelli-Wolfe's representation of Defendant Smith. On the record, Attorney Morelli-Wolfe asserted the attorney-client privilege and did not answer various questions because Defendant Smith had not waived the privilege, as the attorney-client privilege is held by the client, and can

only be waived by the client. Moreover Defendant Smith was not present for Attorney Morelli-Wolfe's deposition and accordingly was not in a position to specifically inform Attorney Morelli-Wolfe that he wished to waive the privilege to allow Attorney Morelli-Wolfe to testify regarding his representation of Defendant Smith. Additionally, as discussed further below, while the Plaintiff attempts to rely on the Defendant Smith's alleged waiver of the attorney-client privilege at his own deposition hours after Attorney Morelli-Wolfe's deposition, Defendant Smith unequivocally did not waive the attorney-client privilege by an affidavit sent to Plaintiff's counsel on April 15, 2015. Accordingly, having Attorney Morelli-Wolfe testify again as to privileged communications, when Defendant Smith has not waived the privilege would constitute an "undue burden, annoyance and expense" and accordingly the Court should issue a protective order under Federal Rule of Civil Procedure 26(c) as to Attorney Morelli-Wolfe's testimony.

The Court should also issue a protective order as to the documents requested from Attorney Morelli-Wolfe and the Law Offices of T.J. Morelli P.C. The Plaintiff served a subpoena *duces tecum* which requested various documents from Attorney Morelli-Wolfe. The documents requested are subject to both attorney client privilege and the attorney work-product doctrine, and Attorney Morelli-Wolfe also asserted this at his deposition. The subpoena *duces tecum* requested *inter alia:* "any and all documents relative to the lien of Plaintiff, relative to a claim by Charlie Smith and/or settlement thereof against Helmut Steinnagel, Allstate Insurance Claim No. 3965871695JBK, policy no. 08491D110 for date of loss 5/8/2007." The documents requested are subject to the attorney work product doctrine. "Indeed, the protections of the work product doctrine extend, at least potentially, to a whole complex of interests, ranging "from clients' interests in obtaining good legal advice . . . . to the interests of attorneys in their own intellectual product." "At its heart the doctrine protects both attorney and client from opposing counsel's

6

"indirect attempt[s] to ascertain the manner in which an adversary is preparing for trial." (citation omitted) *Clute v. Davenport Co.*, 118 F.R.D. 312, 315 (D. Conn. 1988). Accordingly, because the documents sought in the subpoena *duces tecum* are subject to attorney-client work product doctrine, a protective order should enter.

"For the attorney to be subpoenaed to testify to the observations made in the course of that preparation in order to help the putative adversary prove the offense as to which the attorney was providing representation would do substantial injury to the values that justify the work product doctrine." *In Re: Grand Jury Subpoena Dated October 22, 2001 John Doe, A, John Doe, B, John Doe, C v. U.S.* 282 F.3d 156 (2nd Cir 2001). "The work product privilege establishes a zone of privacy for an attorney's preparation to represent a client in anticipation of litigation." *Id.*

Further, the Connecticut Rules of Professional Conduct strictly prohibit attorneys from disclosing information related to his representation of a client without that client's consent. *See* Rule 1.6. This duty of confidentiality extends beyond the end of the attorney-client relationship and attorneys have a continuing duty not to disclose such confidential information. Rule 1.9(c)(2). Violations of these rules are punishable by sanctions and possible disbarment. Absent a valid waiver of the attorney-client privilege and work-product doctrine, these ethical rules prohibit Attorney Morelli-Wolfe from testifying about his work in representing Defendant Smith. Certainly, Attorney Morelli-Wolfe cannot be forced to subject himself to ethical violations merely because the Plaintiff claims that the attorney-client privilege has been waived or that the work product doctrine does not apply.

**b.     Defendant Smith did not waive the attorney-client privilege.**

The Plaintiff argues that Defendant Smith "irrevocably waived" the attorney-client privilege at his deposition and because of this an order compelling responsive testimony and

7

document production is proper.

On February 5, 2015 the Plaintiff deposed Defendant Smith after deposing Attorney

Morelli-Wolfe. At his deposition the Plaintiff's counsel asked Defendant Smith if he would

instruct Attorney Morelli-Wolfe to provide him with documents that he took in course of his

representation of Defendant Smith in the negligence or lien action. Defendant Smith agreed that he

would and he further stated he would waive any claims of privilege regarding those documents.

*See* Transcript of Deposition of Charlie Smith, at p.66-67: 17:-2. Attorney Morelli-Wolfe was

unaware that Defendant Smith supposedly waived the attorney-client privilege. Nevertheless, on

April 16, 2015 Defendant Smith met with Attorney Morelli-Wolfe and indicated that he had not

understood what such a waiver meant and once the waiver was explained to him, Defendant Smith

indicated that he did not waive the attorney-client privilege. *See* "Exhibit A." This was relayed to

Plaintiff's counsel via correspondence on April 16, 2015. *Id.* Accompanying the correspondence

was an Affidavit from Defendant Smith which stated that he did not waive the attorney-client

privilege. The Affidavit stated in part:

> At my February 5, 2015 deposition, I was not fully advised about the
> attorney-client privilege and did not knowingly and intelligently waive the
> attorney-client privileged. Having now been fully advised of the privilege
> and the implications therein, I do **not** waive the attorney-client privilege
> with respect to my conversations with Attorney T.J. Morelli-Wolfe or the
> contents of my file with his office.

(emphasis in the original) *See* "Exhibit A." While Defendant Smith may have indicated at

his deposition that he would be willing to speak with Attorney Morelli-Wolfe regarding

production of the Defendant's file, it is apparent that in the two months after the deposition

Defendant Smith did not undertake any additional actions to waive the attorney-client privilege. In

fact, he did the exact opposite by affirmatively disclaiming the waiver. Nevertheless, even if

Defendant Smith inadvertently disclosed privileged communications in his deposition, the Court

should still find that Defendant Smith did not waive the attorney-client privilege such that it provides a basis for Attorney Morelli-Wolfe to potentially violate his ethical obligations and testify to privileged communicates and/or produce privileged documents.

As set forth above,"[t]o determine whether an inadvertent disclosure waived the attorney-client privilege, courts in Connecticut and the Second Circuit balance the following factors: (1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery and the extent of the inadvertent disclosure; and (4) overreaching issues of fairness." *Harp v. King*, 266 Conn. 747, 768-69, 835 A.2d 953 (2003). Here, in applying the afore-mentioned factors, it is entirely reasonable for Attorney Morelli-Wolfe to exercise an abundance of caution in not disclosing privileged information.   Under the facts of this case as known to Attorney Morelli-Wolfe, it is entirely likely that Defendant Smith did not waive the privilege and that if he did such waiver may have been inadvertent. Here, Defendant Smith took reasonable precaution to prevent privileged disclosures by appearing for his deposition with counsel and had discussions with counsel off the record when questions regarding the attorney-client privilege waiver came up. On April 16, 2015 Defendant Smith timely responded to the Plaintiff's counsel's inquiry from April 15, 2015 regarding the production of documents and compelling testimony by submitting an affidavit stating that he did not waive the attorney-client privilege. Further, the extent of the disclosure made by Defendant Smith at his deposition, if any, was minimal. Lastly, fairness would weigh in favor of Defendant Smith finding that he did not waive the attorney-client privilege. "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." *Swidler & Berlin v. United States*, 524 U.S. 399, 403, 118 S. Ct. 2081, 141 L. Ed. 2d 379 (1998). Accordingly, and given the ethical violations that arise from disclosure of privileged information it is entirely

reasonable for Attorney Morelli- Wolfe to believe that the privilege has not been waived or that such waiver was inadvertent. Attorney Morelli-Wolfe cannot violate the privilege simply because Plaintiff's counsel states his position that the privilege has been waived.

Lastly, the Plaintiff makes the unsupported allegation that "[c]ontempt is required in light of the attempted interference of the witness with the waiver." *See* Doc. 19-1 at p. 3. "The chief characteristic of civil contempt is that its purpose is to compel obedience to an order of the court to enforce the rights of the other party to the action. Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance. This is often accomplished by a purgation provision, whereby a civil contemnor may purge himself of contempt at any time by compliance." *Armstrong v. Guccione*, 470 F.3d 89, 101 (2d Cir. N.Y. 2006) *citing In re Irving*, 600 F.2d 1027, 1031 (2d Cir. 1979). The Plaintiff offers no facts to support the allegation that Attorney Morelli-Wolfe attempted to interfere with Defendant Smith regarding the alleged waiver and only seeks contempt in the very last sentence of the Memorandum, with no additional facts or case law to support such an extraordinary remedial action. A finding of contempt would be unsupported and unsubstantiated. Once again, Defendant Smith is the holder of the attorney-client privilege and he and only he can waive the privilege. He has stated in his affidavit that he did not waive the privilege nor did he intend to waive the privilege during his brief deposition. Attorney Morelli-Wolfe cannot be held to be contemptuous when he has a reasonable basis to believe the attorney-client privilege has not been waived by Defendant Smith especially when disclosure of privileged information presents an ethical violation. Contempt is further inappropriate because should the Court determine that Defendant Smith waived the attorney-client privilege and Attorney Morelli-Wolfe's testimony and production of requested documents are required, Attorney Morelli-Wolfe will comply with the Court's determination.

**WHEREFORE**, Attorney Morelli-Wolfe respectfully requests that this Honorable Court deny Pacific's Motion to Compel as Attorney Morelli-Wolfe is barred by the attorney-client privilege and attorney work product doctrine from either testifying or producing documents related to his representation of Charlie Smith. Further, Attorney Morelli-Wolfe requests that the Court deny the Plaintiff's request for contempt.

By:   */s/ Jody N. Cappello*
Jody N. Cappello (CT 26982)
Joann D. Obi (CT 28744)
Cappello.J@wssllp.com
Winget, Spadafora & Schwartzberg, LLP
177 Broad Street, 10th Floor
Stamford, CT 06901
(203) 328-1200
Fax: (203) 328-1212

11

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2015, a copy of the foregoing Objection was served via FEDEX to the Honorable Judge Ann M. Nevins and the following parties:

The Honorable Judge Ann M. Nevins
Abraham Ribicoff Federal Building
450 Main Street
Hartford, CT 06103

Bruce Raymond, Esq.
Raymond & Bennett LLC
90 National Drive
Suite 3
Glastonbury, CT 06033

Kevin D. Wickless, Esq.
Kevin Wickless Law, LLC
99 Main Street
Suite 3A
Norwich, CT 06360

By:     _/s/ Joann D. Obi__
        Joann D. Obi (CT 28744)
        Obi.J@wssllp.com
        Winget, Spadafora & Schwartzberg, LLP
        177 Broad Street, 10th Floor
        Stamford, CT 06901
        (203) 328-1200
        Fax: (203) 328-1212

**Exhibit A**

Case 14-02046   Doc 27   Filed 07/07/15   Entered 07/07/15 14:03:04   Desc Main
Document   Page 14 of 40

Apr. 16. 2015 11:24AM                                                No. 2913   P. 2
Case 14-02046   Doc 19-11   Filed 05/07/15   Entered 05/07/15 14:16:23   Desc Exhibit
H   Page 3 of 4

# Law Office of T.J. Morelli-Wolfe, P.C.

**118 New London Turnpike**
**Norwich, CT 06360**

**Telephone: (860) 886-9225**
**Telefax: (860) 887-5336**

April 16, 2015

***VIA TELEFAX***

Jay Wollman
Raymond Law Group
90 National Drive, Suite 3
Glastonbury, CT 06033

Re:   Pacific Insurance v Smith

Dear Mr. Wollman:

This responds to your email dated April 13, 2015, regarding the above matter. I was unaware that Mr. Smith supposedly waived the attorney client privilege. I met with him yesterday. During that meeting he was adamant that he did not understand what such a waiver meant. Once explained to him, he insists that any waiver was a mistake and that he does not waive the attorney-client privilege. Attached is an affidavit stating such.

Should you wish to discuss this matter this week as suggested in your email, I am available tomorrow.

Sincerely,

T.J. Morelli-Wolfe

Enclosure

Apr 16 2015 11:24AM                                                No. 2973   P. 3
Case 14-02046   Doc 19-11   Filed 05/07/15   Entered 05/07/15 14:16:23   Desc Exhibit
H   Page 4 of 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IN RE: | ) | Case No. 14-21261 (ASD) |
| CHARLIE SMITH | ) | Chapter 7 |
| DEBTOR | ) | |
| | ) | |
| PACIFIC INS. CO., LTD A | ) | |
| SUBSIDIARY OF THE HARTFORD | ) | AP No. 14-02046 (ASD) |
| FINANCIAL SERVICES GROUP | ) | |
| a/s/o PETER PAN BUS LINES TRUST, | ) | |
| Plaintiff | ) | |
| VS | ) | |
| CHARLIE SMITH, | ) | |
| Defendant | ) | |

<u>AFFIDAVIT</u>

The undersigned, being duly sworn, deposes and says as follows:

1.     I am over the age of eighteen (18) years old, believe in the obligations of an oath and make this Affidavit based on my own personal knowledge;

2.     At my February 5, 2015 deposition, I was not fully advised about the attorney-client privilege and did not knowingly and intelligently waive the attorney-client privilege. Having now been fully advised of the privilege and the implications therein, I do <u>not</u> waive the attorney-client privilege with respect to my conversations with Attorney T.J. Morelli-Wolfe or the contents of my file with his office.

Charlie Smith

Subscribed and sworn to, before me,
this __15__ day of April 2015

Notary Public/Commissioner of the Superior Court

**Exhibit B**



### UNITED STATES OF AMERICA v. LESLIE R. BARTH

### CRIMINAL NO. N-90-5 (WWE)

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*1992 U.S. Dist. LEXIS 18414*

**July 9, 1992, Decided**
**July 9, 1992, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant, principal of a law firm specializing in real estate syndications, was charged with one count of wire fraud in violation of *18 U.S.C.S. § 1343* and *12* counts of mail fraud in violation of *18 U.S.C.S. § 1341*. He filed a motion in limine to suppress at trial the testimony of five former employees, all attorneys, pursuant to the *Fifth Amendment*, *Fed. R. Crim. P. 5*, and *Fed. R. Evid. 501*, on the basis of an attorney/client privilege.

**OVERVIEW:** Defendant's law firm created real estate syndications where investor subscriptions were later financed or sold. In one project, a letter informed investors that they could rescind or redirect their investments, but investors complained that they had not received back their promissory notes. Defendant invoked the attorney/client privilege for attorneys who had worked for his firm because they served as tax counsel to the limited partnership involved in the real estate syndicate. He acted as client to the limited partnership and never waived the privilege. The court noted that the privilege protects communications rather than information, legal but not business advice; but not when a client speaks with a lawyer in the latter's capacity as a business associate or advisor, and not when fraud is involved. The court concluded that in general any testimony by defendant in his role as general partner of the limited partnership to his tax attorneys that addressed the limited partnership's legal matters constituted privileged communications. Any statement of mixed business and legal matters would be protected only if legal matters dominated. All other testimony fell outside the privilege.

**OUTCOME:** The court granted defendant's motion in limine in part and denied in part. It was denied with regard to a witness with whom he did not have any conversation, and with regard to all communications that were sent to third parties, or were not legal in nature, or were not intended to be confidential. It was granted with regard to legal negotiations and to the signing of promissory notes regarding the specific transaction at trial.

**LexisNexis(R) Headnotes**

*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Governments > Courts > Common Law*
[HN1] The attorney-client privilege prevents testimonial disclosure, discovery, or seizure by subpoena of confidential communications between an attorney and his client, unless the client waives the privilege. The purpose of the attorney-client privilege is to encourage full and

1992 U.S. Dist. LEXIS 18414, *

frank communication between attorneys and their clients by assuring clients that their disclosures will be held in confidence. The Federal Rules of Evidence do not list the requirements of the attorney-client privilege. *Fed. R. Evid. 501* merely instructs courts addressing privileges to apply the principles of common law in "the light of reason and experience." Accordingly, common law principles frames the court's analysis. The attorney-client privilege attaches where: (1) legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such (3) the communications relating to that purpose (4) made in confidence (5) by the client (6) are at his insistence permanently protected (7) from disclosure by himself or the legal advisor (8) except the protection be waived.

*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Evidence > Privileges > Attorney-Client Privilege > Waiver*
*Legal Ethics > Client Relations > Confidentiality of Information*
[HN2] An attorney-client relationship exists when a client communicates confidentially with an attorney for the purpose of obtaining a legal opinion or legal representation. The privilege does not apply unqualifiedly to all communications between attorney and client. It is limited to communications which the client either expressly made confidential or which he could reasonably assume under the circumstances would be understood by the attorney as to intended.The attorney-client privilege protects communications rather than information. Thus, the privilege does not impede disclosure of information except to the extent that disclosure would reveal confidential communications.A corporation possesses the attorney-client privilege and may waive or assert it.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN3] The privilege is triggered only by a client's request for legal, as contrasted with business, advice. Tax advice rendered by an attorney is legal advice within the ambit of the attorney-client privilege. The privilege does not arise when a client speaks with a lawyer in the latter's capacity as a business associate, business advisor, or friend, even if legal matters are discussed. Where the discussion involves a mixture of business and legal matters, most authorities hold that the privilege applies

only if the desire to acquire legal advice or services predominates over other reasons for making the communication. The privilege need not, and should not, be raised with regard to statements that would have been made regardless of the subordinate desire to obtain legal services, because the purpose of the privilege is to encourage confidences pertaining to legal matters.

*Evidence > Privileges > Attorney-Client Privilege > General Overview*
[HN4] The attorney-client privilege does not attach where the communication involves fraud. A communication designed to enable or assist a client or an attorney in the commission of a crime or with respect to a continuing crime or fraud is not privileged.

*Evidence > Privileges > Attorney-Client Privilege > Elements*
*Evidence > Privileges > Attorney-Client Privilege > Scope*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN5] The burden of establishing the existence of the attorney-client relationship and its applicability to the particular circumstances presented is upon the party claiming the privilege. Further, that burden is not discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed.The law places the burden on the person claiming the attorney-client privilege to establish all of its elements. Because the burden of proof does not shift, the moving party has the burden of proving by a preponderance the existence of the attorney-client privilege and its applicability to the particular circumstances presented.

*Evidence > Privileges > Attorney-Client Privilege > Exceptions*
[HN6] If there is "reasonable basis" - probable cause - that a fraud or crime has been committed, that will suffice for the purposes of invalidating the attorney-client privilege.

*Evidence > Privileges > Attorney-Client Privilege*
[HN7] Determinations of attorney-client privilege must be made on an individual basis, looking at the testimony

1992 U.S. Dist. LEXIS 18414, *

in question and the particular circumstances surrounding the underlying communication.

**JUDGES:** [*1] Eginton

**OPINION BY:** WARREN W. EGINTON

**OPINION**

### RULING ON MOTION IN LIMINE

A grand jury returned an indictment in this case on January 11, 1990 charging defendant Leslie Barth with one count of wire fraud in violation of *18 U.S.C. § 1343* and nineteen counts of mail fraud in violation of *18 U.S.C. § 1341*. A superseding indictment was returned on May 14, 1992 charging the defendant with one count of wire fraud and twelve counts of mail fraud.

On February 18, 1992 defendant Barth filed a *Fed. R. Civ. P. 12(b)* motion to dismiss the initial indictment and a motion in limine to disqualify certain witnesses anticipated to be called by the government in its case in chief, pursuant to the *Fifth Amendment to the Constitution of the United States, Fed. R. Crim. P. 5,* and *Fed. R. Evid. 501.* Mr. Barth maintains that the testimony of witnesses presented by the government to the grand jury, many of whom he anticipates the government will call at trial, [1] constitutes privileged communications between an attorney and his client. The motion to dismiss was denied.

> 1   The witnesses whose testimony the defendant wishes to suppress at trial include: Steven Sion, Richard Scholnick, George Marvin-Smith, Dana Friedman and David Richheimer. However, because the government does not intend to call Mr. Richheimer as a witness *(Government's Proposed Findings of Fact and Conclusions of Law,* June 5, 1992, p. 1) and did not present evidence on his testimony during the hearing, the court will not discuss the admissibility of his testimony here.

[*2] The court conducted hearings in this matter on April 27 and 28, 1992 and May 8, 1992. On May 14, 1992 the superseding indictment was returned. On May 28, 1992, Mr. Barth was arraigned and pleaded not guilty on counts one through thirteen. Shortly thereafter, the defendant filed several additional motions, [2] and all but one were denied. [3] The only motion remaining for ruling

is the motion in limine.

> 2   Motion to Dismiss Superseding Indictment (#102), Motion for Disclosure (#103), Motion to Postpone Scheduling of Briefs (#104), Motion to Compel Bill of Particulars (#108), Motion to Reduce Bail (#116), Motion for Expedited Hearing (#117), Motion to Postpone Defendant's Brief (#118), and Motion for Adjournment of Jury Selection (#   ).
>
> 3   The Motion for Adjournment of Jury Selection was granted in order to provide an opportunity for appeal of this ruling before the trial, if that is a permitted option for the party that does not prevail.

The court now has reviewed all of the evidence the parties submitted. [*3] Based upon its review, the court, pursuant to *Fed. R. Crim. P. 12 (e),* finds the following facts.

### FINDINGS OF FACT

**Steven Sion:**

1. Steven Sion is currently engaged in the general practice of law in the Las Vegas, Nevada area. He became employed by the law firm of Barth, Richheimer, Marvin-Smith, Friedman, and Scholnick, P.C. [4] in September, 1983 following a paid summer internship in 1982 and a part-time position with the firm during the academic year 1982-1983. Tr. I, 33-37. [5]

> 4   The firm known as Barth, Richheimer, Marvin-Smith, Friedman and Scholnick, P.C. in 1983 was earlier known as Barth & Richheimer, P.C. and Barth, Richheimer & Marvin-Smith. For the purposes of this opinion, references to "the law firm" will refer to any of these three firm names.
>
> 5   "Tr. I,    " refers to the transcript and page numbers of testimony of the April 27, 1992 hearing. "Tr. II,    " and "Tr. III,    " refer to the transcripts and page numbers of testimony of the April 28, 1992 and May 8, 1992 hearings, respectively.

[*4] 2. By 1983, the principal business of the law firm was real estate syndications. Only a "very small amount of work" was tax-related. Most of the work he performed during the internship and part-time

employment involved analyzing leases and preparing cash flow analyses and tax projections relating to real estate transactions. Tr. I, 38-39.

3. The law firm was located in offices at 195 Church Street, New Haven, Connecticut. Housed within the same office space were two other business entities known as the Leslie R. Barth Organization, which later became the Barrick Group, Inc., and North American Investment Resources. In 1982 the firm was located on the twelfth floor of the building and later expanded to either the eighth or tenth floor. There was, however, no physical division of the premises dedicated to the three entities until a time when the Barrick Group occupied space on a floor of the building separate from the law firm. Mr. Sion was located in the Barrick Group's office space. Tr. I, 41-43.

4. Shortly after he was hired, Mr. Sion was assigned by George Marvin-Smith to develop a marketing department of the Leslie R. Barth Organization, later the Barrick Group, to deal [*5] with investors in the various limited partnerships that the Leslie R. Barth Organization and later the Barrick Group promoted. His duties included facilitating the entry of investors into the limited partnerships, negotiating the promissory notes executed by the investors in the limited partnerships, and keeping the investors informed of the progress of the limited partnerships. He also billed investors for any interest due on their promissory notes. He continued in that capacity until he resigned in May, 1985. Tr. I, 44-45, 78, 79, 81. The business of promoting the limited partnerships, including the Barrick Jacksonville Limited Partnership ("BJLP"), was that of the Leslie R. Barth Organization and the Barrick Group, not the firm of Barth, Richheimer, Marvin-Smith, Friedman and Scholnick, and it was to that effort that Mr. Sion devoted 99.9 percent of his time. Tr. I, 82, 90-91.

5. In addition to his investor related work, Mr. Sion continued to make cash flow projections for Richard Scholnick and George Marvin-Smith on properties which were being considered for real estate syndication. Tr. I, 48-49.

6. He also coordinated the printing and proofreading for a private placement [*6] memorandum and subscription documents for a limited partnership, and distributed them to brokers/dealers. In addition, he was the person who received the various subscription documents, including the investors' checks and promissory notes. Mr. Sion reviewed the documents to ensure their proper execution. Tr. I, 49-53.

7. Mr. Sion forwarded indemnity agreements, subscription agreements, security agreements and confidential questionnaires returned to the Barrick Group by various investors to the National Union Fire Insurance Company ("NUFIC"). NUFIC then bonded the notes when they were negotiated to a lending institution. Tr. I, 53-55.

8. Mr. Barth often inquired of Mr. Sion the number of units sold in a particular limited partnership. In situations where the number of units sold was high enough, he then directed Mr. Sion to arrange for the financing or sale of those notes. Mr. Sion also gave George Marvin-Smith the same information. At some point, Mr. Barth told Mr. Sion to arrange for negotiating the notes, and either the defendant, George Marvin-Smith or the accounting department gave him instructions as to what was to be done with the proceeds from the notes. Tr. I, 57-58, [*7] 71, 73.

9. Mr. Sion learned of BJLP in the fall of 1983, but he was not involved in the acquisition of the property that was to be acquired by the partnership. BJLP was to acquire a piece of real estate known as the Landmark Building in Jacksonville, Florida. Tr. I, 59,91.

10. Mr. Sion and the investor relations department began receiving investor subscription documents for BJLP in late 1983. Tr. I, 61.

11. In June 1984 Mr. Sion negotiated the first group of investors' promissory notes at the J. Henry Schroeder Bank and Trust in New York, at the direction of Mr. Barth or George Marvin-Smith. With George Marvin-Smith, Mr. Sion arranged the note closing with the bank and bonding of the notes by NUFIC. Tr. I, 62-64.

12. By corporate resolution of the General Partner of BJLP, Landmark Acquisitions, Inc., Mr. Sion was made a vice president of the General Partner in order to negotiate and endorse the notes on its behalf. Tr. I, 64, 88-89, 91.

13. Mr. Sion participated in a second negotiation of notes in late August 1984, Tr. I, 69, and a third in September, 1984, Tr. I, 70, at the direction of either Mr. Barth or George Marvin-Smith. Tr. I, 71.

1992 U.S. Dist. LEXIS 18414, *7

14. On at least one occasion, Mr. [*8] Sion called Mr. Barth from the bank to receive wiring instructions and was told by the defendant to transfer the funds to the partnership bank account in Connecticut. Mr. Sion then communicated the instruction to bank personnel. Tr. I, 66, 68, 130.

15. Mr. Sion kept Mr. Barth and George Marvin-Smith advised of the number of investors' notes he had received and the minimum number of notes NUFIC required before it would issue a bond. Mr. Sion did not offer his opinion or advice to Mr. Barth or Mr. Marvin-Smith concerning what should be done with the notes. Tr. I, 74, 84.

16. Furthermore, when he was instructed to negotiate the notes neither his opinion nor his advice was sought as to whether the notes should be negotiated. Tr. I, 73-4, 83.

17. In his dealings with NUFIC, J. Henry Schroeder Bank and Merbans, Mr. Sion never represented that he was acting in any particular capacity. When Mr. Sion negotiated investor notes on the first and perhaps second occasion, George Marvin-Smith introduced him to Kevin O'Hagen. Mr. O'Hagen was employed by J. Henry Schroeder Bank and later Merbans. It is Mr. Sion's belief that he (Sion) was viewed as an employee of the Barrick Group. Tr. [*9] I, 74-76.

18. In obtaining a bond for the investors' notes from NUFIC, the only legal skill he employed was to determine whether documents submitted to NUFIC were properly executed. Tr. I, 77.

19. Among his other duties in the marketing department was correspondance with investors, Tr. I, 85.

20. **Government Exhibit 1** is a letter dated September 11, 1984. It was sent to all investors advising them of purported changes in the way in which the Landmark Building was to be acquired by BJLP. It was sent over the authorized signature of Steven Sion. Tr. I, 91, 93, 94, 98.

21. Mr. Sion either drafted or assisted in the drafting of the letter based on information supplied by entirely Mr. Barth and Mr. Marvin-Smith. Mr. Sion then caused it to be sent to BJLP investors at the direction of Mr. Barth and Mr. Marvin-Smith. Tr. I, 93-99.

22. For several months after **Government Exhibit 1**

was sent to BJLP investors, Mr. Sion received additional information from the defendant, George Marvin-Smith and Richard Scholnick concerning the status of the Landmark Building project. Mr. Barth told Mr. Sion that the partnership was not acquiring the asset. Tr. I, 99.

23. The defendant then [*10] asked Mr. Sion to draft documents by which BJLP investors could rescind their investments or redirect them elsewhere. Mr. Barth instructed Mr. Sion that the rescission agreement should conform to terms of the private placement memorandum. Tr. I, 99, 103.

24. **Government Exhibit 2** was sent to BJLP investors in or about December 1984. Tr. I, 100, 102, 104. It is a rescission agreement which represented to the investors that their promissory notes would be returned and not negotiated or otherwise assigned. Tr. I, 101.

25. It is unclear exactly what input Mr. Sion had in drafting of that document. Tr. I, 102-103, 108.

26. **Government Exhibit 2** was created either by Mr. Sion, who incorporated the changes the defendant wished to make, Tr. I, 102, 103, or it was created by the defendant. Tr. I, 116, 121.

27. A second rescission agreement, **Government Exhibit 3**, was sent to BJLP investors in or about late February, 1985. Tr. I, 108, 111, 118. Mr. Sion brought to Mr. Barth's attention the fact that the first rescission agreement, **Government Exhibit 2,** omitted a provision for the payment of interest to the investors. Tr. I, 108, 109.

28. **Government Exhibit 3** told [*11] the investors that their notes would be "returned in due course." The change in the language concerning the return of the notes was directed by Mr. Barth. Tr. I, 109-110, 115, 121.

29. Steven Sion signed Mr. Barth's name to the second version of the rescission agreement at Mr. Barth's direction and with his permission. Tr. I, 117, 119, 120, 122.

30. **Government Exhibit 4** is the third version of the rescission agreements sent to BJLP investors in or about March 1984. Tr. I, 126-27. **Government Exhibit 4** replaced the language that the notes would not be negotiated or otherwise assigned and would be marked void or cancelled. Tr. I, 123.

31. The change in the language concerning the return of the notes was made by Mr. Sion at Mr. Barth's direction. Tr. I, 123, 125-26. Mr. Barth also directed Mr. Sion to sign the rescission agreements represented by **Government Exhibit 4.** Tr. I, 124-25.

32. **Government Exhibit 5** is a redirection agreement. Mr. Sion prepared the original draft and gave it to Mr. Barth to review. Mr. Barth then made changes and returned it to Mr. Sion with the directions that he put it into final form, sign it for the defendant and mail it to certain [*12] investors. Tr. I, 128, 129.

33. After the rescission agreements were mailed, Mr. Sion had conversations with investors or the brokers/dealers, and reported the substance of those conversations to Mr. Barth. Tr. I, 132.

34. Among the complaints of the investors which he reported to the defendant, Mr. Sion told the defendant that certain investors wanted to know why they had not received their promissory notes back. Mr. Barth responded to Mr. Sion that the funds to repurchase the notes were in escrow. Tr. I, 132-135.

35. Mr. Sion expressed his concern about the return of the notes to the defendant, and suggested giving substitute notes to the bonding company and the banks. Mr. Barth then directed Mr. Sion to determine if the bonding company and the banks would accept such substitute promissory notes for the investors' notes. Tr. I, 135-36.

36. The defendant directed Mr. Sion to meet with NUFIC to determine if the investors' notes could be replaced with substitute promissory notes. Tr. I, 137, 145-46.

37. Mr. Sion viewed this direction from the defendant as coming from the chief officer of a real estate investment group to a subordinate in that group, and in the context of [*13] conducting that group's business. He did not consider himself acting in the capacity of an attorney. Tr. I, 137-39.

38. Mr. Sion met with a NUFIC representative in early 1985 to present the proposal concerning replacement of the investors' notes with substitute promissory notes. Following the meeting, Mr. Sion reported to Mr. Barth that NUFIC was willing to accept four or five promissory notes totaling the approximate amount of the investors' notes from certain of the defendant's business entities. Mr. Sion thought it was possible that NUFIC also sought a personal guarantee from Mr. Barth on the unsecured notes. Tr. I, 140-142.

39. Mr. Sion prepared the necessary documents and gave them to the defendant. The documents, to the best of Mr. Sion's knowledge, were never executed. Tr. I, 143-47.

40. Mr. Sion resigned in May 1985. Throughout his association with the defendant, he was paid by checks drawn on a law firm account. Tr. I, 144, 162.

41. Mr. Sion knew that the BJLP Private Placement Memorandum described BJLP as a client of the law firm, but he did not consider that he performed legal work for BJLP. Tr. I, 158-161. **Richard Scholnick:**

42. Richard Scholnick is [*14] currently president of North Eastern Video. Its headquarters are in Madison, Connecticut. Tr. II, 27. He is a graduate of Tulane University School of Law and holds a Masters Degree in taxation from the New York University Law School. Tr. II, 28. He was admitted to the Connecticut bar in March 1980, Tr. II, 29.

43. Scholnick began his employment with the law firm in March 1980. During the employment interview, Mr. Barth told Mr. Scholnick he was looking for a tax attorney who had good knowledge of the Internal Revenue Code and reasonable business sense. Tr. II, 30-31.

44. In the beginning he performed tax work exclusively. He soon realized that the firm had a strong business orientation in the area of real estate syndication and equipment leasing, and that he would have to become more involved in the business aspects of the law firm's work if he were to advance within the firm. Tr. II, 32.

45. Scholnick's name was added to the law firm's name in 1983 even though he had no ownership interest. He was paid at all times by the law firm. Tr. II, 32-33.

46. In the summer of 1980 he asked Mr. Barth if he could become more involved in real estate syndication work. The defendant [*15] agreed and suggested to Mr. Scholnick that real estate acquisition was a fertile area. Thereafter, the defendant instructed Mr. Scholnick in the financial aspects of real estate acquisition and real estate

syndication. Tr. II, 34-36.

47. The Leslie R. Barth Organization, later the Barrick Group, and North American Investment Resources occupied the same office space as did the law firm. The Leslie R. Barth Organization acquired real estate or contracted for the purchase of real estate for real estate syndications. At any given time, it was not possible to distinguish who was working for the Leslie R. Barth Organization or the Barrick Group and who was working for the law firm. Tr. II, 36-37.

48. After telling Mr. Barth that he was interested in real estate syndication, Mr. Scholnick began the process of obtaining business related information from sellers of potential syndication properties. Mr. Scholnick's first successful acquisition involved property located near Orlando, Florida. Tr. II, 40-43.

49. Mr. Scholnick followed a self-imposed practice of keeping time sheets for a short period. The law firm, however, did not require its attorneys to keep time sheets. Tr. II, [*16] 44-45.

50. Mr. Scholnick believed that his financial success was tied primarily to the results he produced in the area of property acquisition. He used both his business skills and legal skills in performing his work. Tr. II, 45-47.

51. Mr. Scholnick drew on his legal skills, but the "line by line" contractual negotiations were done by others. Tr. II, 47-48.

52. Mr. Scholnick first became acquainted with the Landmark Building in Jacksonville, Florida in 1983 through a friend, Richard Mosse, who was then a real estate broker. Tr. II, 50-51.

53. Mr. Scholnick acquired information about the Landmark Building on his own, and presented a preliminary proposal to the defendant who, while skeptical about acquiring the property because it was a "to-be-built" structure, was interested because of certain tax advantages. Tr. II, 51.

54. Mr. Scholnick developed additional information about the property that he related to the defendant. He told the defendant that the renovation of the building and the construction of an attached parking garage was to be done by Robert McHale and Alfred Tadros, who owned the contract rights to acquire the property and an option

to purchase the property [*17] on which the parking garage was to be constructed. He told the defendant further that the economic viability of the project was tied to the construction of the parking garage. He also told the defendant that the major tenant for the building was bankrupt and that new leasing arrangements were necessary. Tr. II, 53-54. Mr. Scholnick gave the defendant his opinion as to how the project could be saved. Tr. II, 53-55.

55. A contract to acquire the property was entered into during the summer of 1983, and a prospectus inviting investments in a prospective limited partnership was issued late in 1983. Tr. II, 56-57, 62-63.

56. Mr. Scholnick reviewed the prospectus, focusing primarily on the demography of the area and the market. The decision to issue the prospectus was the defendant's. Tr. II, 57-58.

57. In late November or early December, 1983, Mr. Scholnick became concerned about the possibility that the developers might lose the option to purchase the land for the parking garage. Alfred Tadros told Mr. Scholnick of his reluctance to continue making payments on the purchase option. Mr. Scholnick shared his concerns with the defendant. He was also concerned about the general financial [*18] wherewithal of Mr. Tadros and Mr. McHale. Tr. II, 58-59.

58. These, in addition to other concerns, were expressed to the defendant, but the defendant decided to continue the offering. Tr. II, 60.

59. In the first quarter of 1984, Mr. Scholnick became very concerned about the project because he understood that Mr. McHale and Mr. Tadros had not obtained construction financing. Mr. Scholnick expressed this concern to the defendant in addition to telling him that he had lost complete confidence in the ability of Mr. McHale and Mr. Tadros to fulfill their responsibilities. The defendant then instructed Mr. Scholnick to assist Mr. McHale and Mr. Tadros in their efforts to obtain financing. Tr. II, 60-61.

60. In or about late April, 1984, Mr. Barth accepted Mr. Scholnick's conclusion that Mr. McHale and Mr. Tadros could not fulfill their responsibilities. He gave Mr. Scholnick the responsibility to obtain financing. Tr. II, 62, 64-65.

61. The defendant was also aware, through Mr. Scholnick, of the lack of success in leasing the building. Tr. II, 65-66.

62. Eventually, Mr. Scholnick was able to negotiate a commitment for construction financing from Freedom Savings and Loan that [*19] called for a substantial personal guarantee by the defendant. He personally presented the commitment letter to Mr. Barth in late July or early August, 1984, and pointed out the escrow requirement. The defendant told Mr. Scholnick that he would not sign the commitment personally. Tr. II, 66-67.

63. Mr. Barth and Mr. Scholnick then agreed that Mr. Scholnick would move on to other deals and no longer be involved in the Landmark Building project. Tr. II, 67-68.

64. Although Mr. Scholnick was an employee of the law firm, he was, at least as concerned BJLP, the co-director of property acquisition for the Barrick Group. **Government Exhibit 6;** Tr. II, 72-73. His primary responsibility was, in fact, property acquisition. Tr. II, 73.

65. The Landmark Building project was to have been developed collectively by the General Partner, Landmark Acquisitions, the law firm, the Barrick Group, North American Investment Resources, and Barrick Property Management. **Government Exhibit 6;** Tr. II, 75.

66. These business entities, despite the alleged distinctions, were no more than names under which the defendant conducted his business, and Mr. Scholnick's role was to follow the directions [*20] given to him by the defendant. Tr. II, 85, 87-90, 93.

**George Marvin-Smith:**

67. George Marvin-Smith is currently employed as vice president and secretary of North Eastern Video. He works with Richard Scholnick. Tr. II, 100.

68. He is a graduate of Franklin Pierce Law School and holds a masters degree in taxation from New York University. Tr. II, 101-102.

69. He was hired by the defendant in December, 1978. Tr. II, 102.

70. Mr. Marvin-Smith began by doing basic tax work. After about a year, at the defendant's request, Mr. Marvin-Smith focused his efforts on real estate

acquisition for the Leslie R. Barth Organization which later became the Barrick Group, Incorporated. Tr. II, 103-108.

71. In that capacity, Mr. Marvin-Smith would report his findings concerning the desirability of properties, from a business standpoint, to the defendant. Tr. II, 108-109.

72. Mr. Marvin-Smith's name was eventually added to that of the law firm but his position remained the same. Tr. II, 110. Throughout his employment, he had no equity interest in the law firm, but he did receive his salary from the law firm. Tr. III, 92-93.

73. At some point, Mr. Marvin-Smith's efforts shifted from [*21] property acquisition to the financing aspects of forming limited partnerships. Tr. II, 113-114.

74. He became aware of the Landmark Office Building project in late 1982 or early 1983, but he was not involved in the acquisition of the property. Tr. II, 112. He was aware of the way in which the acquisition of the property was to occur. Tr. II, 115-116.

75. Mr. Marvin-Smith was present at one or more meetings, also attended by the defendant, at which serious problems with the acquisition of the Landmark Building were discussed. Tr. II, 116-117.

76. Among the problems discussed were the loss of a major tenant, the inability of the developers of the property to obtain construction financing, and the loss by the developer of the right to acquire the parking garage property. Tr. II, 117-119.

77. At one of the meetings the defendant and Mr. Marvin-Smith attended, the defendant decided to become involved directly in the renovation of the building, possibly along with another company owned by Harold Rothstein. Tr. II, 119-120, 122-123; Tr. III, 75.

78. Having made this decision, the defendant directed Mr. Marvin-Smith to research the feasibility of doing the renovation. Tr. II, 121-122.

[*22] 79. Mr. Marvin-Smith made at least one trip to Jacksonville, Florida during the second half of 1984 at the defendant's direction to further his research into the work that needed to be done on the property. Tr. III, 72-74, 76-77.

80. **Government Exhibit 7** is a letter dated July 27, 1984 that was directed to all investors in BJLP over the authorized signature of Mr. Marvin-Smith. Tr. III, 77, 80.

81. The letter expressed the Barrick Group's dissatisfaction with the original developers of the project and told the investors that Barrick and Park Development were undertaking the project. **Government Exhibit 6.**

82. It is uncertain which if any paragraphs in the letter were drafted specifically by Mr. Marvin-Smith, and it was probably the end product of the efforts of others in addition to Mr. Marvin-Smith. It was sent over his signature because of his role as liaison with investors. Consistent with the procedures followed when dealing with investors, the letter was reviewed and approved by the defendant. Tr. III, 78-84.

83. Whether or not Mr. Marvin-Smith drafted the paragraph that explained the relationship between the Barrick Group and Park Development in developing [*23] the project, the defendant told Mr. Marvin-Smith that such a relationship existed. Tr. III, 81-82.

84. Mr. Marvin-Smith was involved in the financing of BJLP Tr. II, 126.

85. In June 1984, the defendant directed Mr. Marvin-Smith along with Steven Sion to negotiate the promissory notes of certain of the investors in BJLP. Tr. II, 126, 128. He conveyed to the bank the defendant's instructions as to where the proceeds from the notes were to be sent. Tr. II, 128-129.

86. Mr. Marvin-Smith may have been present on the two subsequent occasions when BJLP promissory notes were negotiated. Any instruction he gave to the banks concerning the disposition of the proceeds from the notes had given to him by the defendant. Tr. II, 127; Tr. III, 70-71.

87. Mr. Marvin-Smith was described in BJLP Private Placement Memorandum as a co-director for property acquisition and a principal in tax counsel, the law firm. **Government Exhibit 6.**

88. Regardless of the titles Mr. Marvin-Smith held, he was engaged in the business of raising money to do real estate syndications, and he was doing so at the direction of the defendant. His attempts to salvage the Landmark Building project and BJLP were [*24] also done at the defendant's direction. Mr. Marvin-Smith did not act as counsel to the defendant, Landmark Acquisitions or BJLP. Tr. III, 96, 99, 103, 104, 106, 109, 111.

**Dana Friedman:**

89. Dana Friedman is currently engaged in the practice of law with the firm of Harlow, Adams and Friedman, P. C. Tr. III, 4.

90. He received a law degree and a masters degree in taxation from George Washington University. Tr. III, 5.

91. Mr. Friedman was admitted to practice law in Connecticut in 1978.

92. Before joining the law firm in 1979, which was then called Barth & Richheimer, P.C., he had been employed by the Internal Revenue Service in Washington, D.C. and a law firm in West Haven, Connecticut. At Barth & Richheimer his work primarily involved real estate acquisition, finance, leases and property management. Tr. III, 6, 9.

93. Although his name was added to the firm's name in or about 1983, his relationship to the firm did not change at all. He remained an employee and his salary was paid by the law firm. Tr. III, 9-10, 15.

94. By 1983 and 1984 ninety percent of the legal work he did was for the Barrick Group to acquire property for real estate syndication. Tr. III, 16, 18-20, [*25] 21-22.

95. Mr. Friedman first heard of BJLP in 1983 or 1984. Tr. III, 25-26.

96. Mr. Friedman may have prepared the contract for the purchase of the property that was to be acquired by BJLP, but he did at least review it. Tr. III, 27.

97. In addition, he reviewed loan documents from a lender in Florida. Tr. III, 28.

98. Mr. Friedman was present at a meeting at the law firm when it was decided not to proceed further with BJLP because of several problems that had arisen. Tr. III, 30.

99. Mr. Friedman's role in the acquisition of BJLP was minimal. He had no specific discussion with the

1992 U.S. Dist. LEXIS 18414, *25

defendant about the project. Tr. III, 31.

**Leslie Barth:**

100. The law firm of Barth, Richheimer, Marvin-Smith, Freidman and Scholnick was a professional corporation. Mr. Barth was its sole owner and president. Tr. III, 119, 132.

101. BJLP consisted of a general partner and at least one limited partner. Tr. III, 124. The corporate general partner of BJLP was Landmark Acquisitions, Inc. ("Landmark") Tr. III, 125. Leslie Barth was the sole shareholder of Landmark. Tr. III, 125. The Barrick Group was also solely owned by Leslie Barth. Tr. III, 142.

102. The law firm was retained by [*26] BJLP as tax counsel. Its role was to prepare an offering memorandum and assist in the syndication of property located in Jacksonville, Florida. Tr. III, 121; **Government Exhibit 6.** Mr. Barth testified that the law firm was compensated by BJLP for services rendered and that the law firm was referred to in the private placement memorandum as either legal services or tax counsel. There was no further evidence introduced in support of the claim that the law firm actually received compensation for its services to BJLP. [6] Tr. III, 129.

> 6   The private placement memorandum for the BJLP was not entered into evidence in its entirety. It may contain details on the financial arrangement between the law firm and BJLP.

103. Although the law firm prepared the private placement memorandum, the offering was made by the Barrick Group. Tr. III, 121; **Government Exhibit 6.**

104. Mr. Barth did not describe any specific conversations concerning BJLP in which he sought legal advice as a client from an attorney he employed. Instead, [*27] he testified that, "My feeling and my own characterization was that I was acting on behalf of the limited partnership through my role as the general partner and they were advising me in their capacities as members of the Barth, Richheimer firm." Tr. III, 127. In his conversations with Sion, Scholnick, Friedman, and Marvin-Smith, there was no distinction made between Mr. Barth's role in the law firm and his role as general partner in BJLP. Tr. III, 141.

105. The defendant believed he did not need to

differentiate between his position as the principal in the law firm and his position as the principal in BJLP in his discussions with employees of the law firm because he assumed the employees understood the distinction. Tr. III, 130, 141-142.

106. Mr. Barth claims the privilege of attorney/client for BJLP and Landmark, and said he has never waived that privilege. Tr. III, 131.

**CONCLUSIONS OF LAW**

Defendant Barth broadly asserts that all communications between himself and Attorneys Sion, Skolnick, Marvin-Smith, and Friedman with regard to the Barrick-Jackson Limited Partnership ("BJLP") should be disqualified from introduction at trial because they constitute communications [*28] protected under the attorney-client privilege. He bases this on the fact that the law firm served as BJLP's tax counsel. He further contends that the communications involved legal and not business advice, that during the conversations at issue he was acting in his capacity as principal in BJLP, the "client," and not as president of the law firm, the "tax attorney" and that he never waived the privilege.

**The Attorney/Client Privilege:**

[HN1] The attorney-client privilege prevents testimonial disclosure, discovery, or seizure by subpoena of confidential communications between an attorney and his client, unless the client waives the privilege. Lilly, *An Introduction to the Law of Evidence,* 2d, § 9.6. The purpose of the attorney-client privilege is to encourage full and frank communication between attorneys and their clients by assuring clients that their disclosures will be held in confidence. *Upjohn Co. v. United States, 449 U.S. 383, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981).* The Federal Rules of Evidence do not list the requirements of the attorney-client privilege. *Fed. R. Evid. 501* merely instructs courts addressing privileges to apply the principles of common law in "the light [*29] of reason and experience." Accordingly, common law principles will frame our analysis.

The attorney-client privilege attaches where:

(1) legal advice of any kind is sought

(2) from a professional legal advisor in his capacity as such

(3) the communications relating to that purpose

(4) made in confidence

(5) by the client

(6) are at his insistence permanently protected

(7) from disclosure by himself or the legal advisor

(8) except the protection be waived. 8 Wigmore, Evidence § 2292 at 554 (McNaughton rev. 1961). *See In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1036 (2d Cir. 1984), United States v. Bein, 728 F.2d 107, 112 (2d Cir. 1984).*

**Attorney-Client Relationship:**

[HN2] An attorney-client relationship exists when a client communicates confidentially with an attorney for the purpose of obtaining a legal opinion or legal representation. The privilege does not, however, apply unqualifiedly to all communications between attorney and client. It is "limited to communications which the client either expressly made confidential or which he could reasonably assume under the circumstances [*30] would be understood by the attorney as to intended." McCormick, Evidence at 91.

The attorney-client privilege protects communications rather than information. Thus, the privilege does not impede disclosure of information except to the extent that disclosure would reveal confidential communications.

A corporation possesses the attorney-client privilege and may waive or assert it. *Upjohn Co. v. United States, 449 U.S. 383, 390, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). See also In re O.P.M. Leasing Services, 670 F.2d 383, 386 (2d Cir. 1982).*

**Legal v. Business Advice:**

[HN3] The privilege is triggered only by a client's request for legal, as contrasted with business, advice. *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037 (2d Cir. 1984).* Tax advice rendered by an attorney is legal advice within the ambit of the attorney-client privilege. *Ibid.*

The privilege does not arise when a client speaks with a lawyer in the latter's capacity as a business

associate, business advisor, or friend, even if legal matters are discussed. Lilly, *An Introduction to the Law of Evidence,* 2d Ed., § 9.6. Where the discussion [*31] involves a mixture of business and legal matters, most authorities hold that the privilege applies only if the desire to acquire legal advice or services predominates over other reasons for making the communication. The privilege need not, and should not, be raised with regard to statements that would have been made regardless of the subordinate desire to obtain legal services, because the purpose of the privilege is to encourage confidences pertaining to legal matters. Lilly, *supra.*

**Fraud/Crime Exception:**

In addition, [HN4] the privilege does not attach where the communication involves fraud. A communication designed to enable or assist a client or an attorney in the commission of a crime or with respect to a continuing crime or fraud is not privileged. *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1033 (2d Cir. 1984).*

**Burden of Proof:**

[HN5] The burden of establishing the existence of the attorney-client relationship and its applicability to the particular circumstances presented is upon the party claiming the privilege. *United States v. Schenectady Sav. Bank, 525 F. Supp. 647, 652 (N.D.N.Y. 1981) See In re Katz, 623 F.2d 122, 125 (2d Cir. 1980).* [*32] Further, "that burden is not, of course, discharged by mere conclusory or ipse dixit assertions, for any such rule would foreclose meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *In re Bonanno, 344 F.2d 830 (2d Cir. 1965).*

During the evidentiary hearing, defense counsel [7] argued that the party claiming the privilege merely has to show by a preponderance that the attorney-client privilege was legitimately invoked, and that thereafter the burden of going forward with the evidence shifts to the government to show that the communication is not privileged. Tr. II, 9-14. *See also* Tr. I, 177. This position is not supported by case law. Neither case cited by defense counsel [8] draws this conclusion, and an overwhelming number of cases consistently maintain that the burden is placed on the person claiming the privilege. *In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)* ("The law places the burden on the person claiming the attorney-client privilege to establish all of its elements").

*United States v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983).* [*33] Because the burden of proof does not shift, defendant Barth, as the moving party, has the burden of proving by a preponderance the existence of the attorney-client privilege and its applicability to the particular circumstances presented.

> 7    The defendant was represented by Attorney Leon Greenspan during the hearing, but as of May 15, 1992 he was permitted to withdraw and Mr. Barth is now representing himself *pro se.* He does, however, have an attorney assisting him on an advisory basis who had previously served as his court-appointed counsel. The advisory counsel, Attorney John Walkley, was present during the entire hearing.
>
> 8    *In re Grand Jury Proceedings, 434 F. Supp. 648 (E.D. Mich. 1977);* and *Philadelphia v. Westinghouse Electric Corp., 210 F. Supp. 483 (E.D. Pa. 1962).*

**General Conclusions:**

There was an attorney-client relationship between the law firm and the limited partnership. But the existence of such a relationship, standing [*34] alone, will not trigger the attorney-client privilege. The movant must further show that each communication in question was primarily legal, not business, in nature, and intended to be confidential. If the communication was in furtherance of a crime or fraud, the privilege does not apply.

Therefore, generally speaking, any testimony relating to statements made by Mr. Barth in his role as general partner of BJLP to his tax attorneys which addressed legal matters in the context of BJLP will constitute privileged communications under the attorney-client privilege and be disqualified from presentation at trial. A statement which involves a mixture of business and legal matters will be protected only if the legal matters dominate. All other testimony, including business and other non-legal discussions between Barth and the attorneys concerning BJLP, falls outside the privilege and may be introduced at trial. Testimony of witnesses concerning their duties as employees of the defendant obviously does not call for answers that reveal confidential legal communications and merely constitutes non-legal background information and is not privileged. *In re Special, September 1983, Grand Jury, 608 F. Supp. 538, 542 (S.D. Ind. 1985).* [*35]

The facts clearly justify application of this approach. The law firm of Barth, Richheimer, Marvin-Smith, Friedman & Scholnick was retained as tax counsel to BJLP for the purpose of preparing offering papers and providing tax advice. All of the witnesses whose testimony is the subject of this motion were attorneys in the law firm and performed at least some tax work. Leslie Barth was the sole owner of Landmark, Inc., the general partner in BJLP. This satisfies the basic requirement that an attorney-client relationship exist. Secondly, at all relevant times Barth said he believed he was speaking in confidence and in the role of principal in BJLP.

It should be noted, however, that very little testimony will be affected by such an application of the privilege, because many of the communications involved either non-legal matters or legal documents that were later sent to third parties, thus losing confidentiality. The fraud exception is not invoked here because the issue of fraud will not be resolved until the conclusion of the trial. However, [HN6] if there is "reasonable basis" - probable cause - that a fraud or crime has been committed, that will suffice for the purposes of invalidating [*36] the attorney-client privilege. *In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032 (2d Cir. 1984).*

[HN7] Determinations of privilege must be made on an individual basis, looking at the testimony in question and the particular circumstances surrounding the underlying communication. Therefore, the motion in limine is granted in part and denied in part as delineated below. Any testimony presented at the hearing that is not commented on herein should be presumed to be unprotected.

**Testimony of Friedman:**

None of Dana Friedman's testimony is privileged because he did not testify as to any conversations with the defendant.

**Testimony of Sion:**

Testimony of Steven Sion relating to Barth's directions to him concerning BJLP note negotiations and proceeds thereof is privileged.

Testimony of Steven Sion relating to the form letter is not privileged because the letter was later sent to third parties.

1992 U.S. Dist. LEXIS 18414, *36

Testimony of Steven Sion relating to rescission agreements is not privileged because those agreements were later sent to third parties.

Testimony of Steven Sion relating to the redirection of the investment agreement is not privileged because the agreement [*37] was later sent to third parties.

Testimony of Steven Sion relating to directions from Barth about what Sion should tell investors who complained about the notes is not privileged because such communications were not legal in nature.

Testimony of Steven Sion relating to directions from Barth about structuring a deal with National Union to replace the notes with substitute promissory notes is not privileged because Barth directed that such communications be disclosed to third parties.

Testimony of Steven Sion relating to conversations with Barth about signing the substitute promissory notes is privileged.

Testimony of Steven Sion relating to his letter of resignation is not privileged because it is not legal in nature.

**Testimony of Scholnick:**

Testimony of Richard Scholnick relating to conversations with Barth about the Jacksonville property is not privileged because it was primarily business, not legal, in nature.

Testimony of Richard Scholnick relating to Barth's directions about obtaining non-recourse financing for construction is not privileged because it was not intended to be confidential.

**Testimony of Marvin-Smith:**

Testimony of George Marvin-Smith relating to [*38] conversations with Barth about renovating the Jacksonville property is not privileged because it is primarily business, not legal, in nature.

Testimony of George Marvin-Smith relating to conversations regarding financing arrangements for BJLP is not privileged because the communications were intended to be communicated to third parties (banks, bonding companies, etc.).

**Conclusion:**

The defendant's motion in limine is granted in part and denied in part as delineated above.

SO ORDERED.

This 9th day of July, 1992

Bridgeport, Connecticut

Warren W. Eginton, U.S.D.J.



**EXPERT CHOICE, INC., -Plaintiff -v- GARTNER, INC., -Defendant.**

**CIVIL 3:03CV02234(CFD) (TPS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2007 U.S. Dist. LEXIS 21208*

**March 27, 2007, Decided**

**PRIOR HISTORY:** *Expert Choice, Inc. v. Gartner, Inc., 2006 U.S. Dist. LEXIS 41466 (D. Conn., June 21, 2006)*

**COUNSEL:** [*1] For Expert Choice, Plaintiff: David H. Thompson, LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC; Derek L. Shaffer, LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC; James A. Budinetz, LEAD ATTORNEY, Pepe & Hazard, Hartford, CT; Stuart M. Paynter, LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC; Thomas J. Rechen, LEAD ATTORNEY, Pepe & Hazard, Hartford, CT.

For Gartner, Inc, Plaintiff: Daniel P. Fox, LEAD ATTORNEY, Shipman & Goodwin -ConstPlza-Htfd, Hartford, CT; Frederick S. Gold, LEAD ATTORNEY, Shipman & Goodwin, Stamford, CT; Shari M. Goodstein, LEAD ATTORNEY, Shipman & Goodwin, Stamford, CT; Susan S. Murphy, LEAD ATTORNEY, Shipman & Goodwin -ConstPlza-Htfd, Hartford, CT.

For Ernest Forman, Counter Defendant: Thomas J. Rechen, LEAD ATTORNEY, Pepe & Hazard, Hartford, CT; David H. Thompson, LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC; James A. Budinetz, LEAD ATTORNEY, Pepe & Hazard, Hartford, CT; Stuart M. Paynter, LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC.

For Expert Choice, Counter Defendant: David H. Thompson, LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC; James A. Budinetz, LEAD ATTORNEY, Pepe & Hazard, Hartford, CT; Stuart M.

Paynter, [*2] LEAD ATTORNEY, Cooper & Kirk, PLLC, Washington, DC.

**JUDGES:** Thomas P. Smith, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Thomas P. Smith

**OPINION**

**RULING ON MOTION OF EXPERT CHOICE AND ERNEST FORMAN TO COMPEL CERTAIN DOCUMENTS WITHHELD BY DEFENDANT**

Pending before the court are three versions of a motion by Plaintiff/Counterclaim-Defendant Expert Choice, Inc. ("ECI") and Counterclaim-Defendant Ernest Forman ("Forman") to compel certain documents withheld by Defendant/Counterclaim-Plaintiff Gartner, Inc. ("Gartner"). **(Dkt. # # 128, 135 and 138)**. The redacted version of the motion is listed as **Dkt. # 128**, the unredacted version is listed as **Dkt. # 135**, and a supplement to the motion is listed as **Dkt. # 138**. Pursuant to *Rule 37(a) of the Federal Rules of Civil Procedure*, Local Rule 37(a), and Paragraph 17 of the November 5, 2004 Protective Order Regarding Confidential Information and Documents ("Protective Order"), ECI and Forman request the Court to order:

> a) an *in camera* review of a set of documents which Gartner asserts was

inadvertently produced to opposing counsel and to which Gartner subsequently asserted [*3] attorney-client privilege and work product doctrine;

b) an *in camera* review of a set of documents withheld by Gartner on the basis of privilege but which ECI and Forman believe to fall within the crime-fraud exception; and

c) an order compelling Gartner to produce all documents currently being withheld as privileged and which evidence knowledge by relevant counsel of a particular contract, on the grounds that Gartner has waived the attorney-client privilege with respect to those documents by placing the contract at issue by way of an offensive counterclaim. [1]

---

1  The motion also requests an order compelling Gartner to produce certain backup tapes ostensibly housing electronic copies of responsive documents. Gartner represents that the parties, through counsel, have agreed to work cooperatively on this issue and that no action is currently required by the court. (Def.'s Mem. Opp. Mot. 49). Thus, the court finds that this issue is moot.

On February 21, 2007, the Court ordered Gartner to submit [*4] for *in camera* review all documents responsive to the plaintiff's discovery requests that were currently being withheld on the basis of the attorney-client privilege and/or work-product doctrine.

## I. FACTS

The relevant facts, as set forth in the motions, are as follows. Gartner is an information technology, research, events and consulting company that provides clients with a variety of subscription-based publications and consulting services. Non-party Decision Drivers Incorporated ("DDI") is a wholly owned subsidiary of Gartner, and was created to act as licensee of a software product called "Expert Choice," which is owned by a corporation bearing the same name, plaintiff Expert Choice, Inc. The Expert Choice software was marketed

by DDI under the name "Decision Drivers." ECI's software was based on a mathematical theory known as the Analytic Hierarchy Process ("AHP"). The original license agreement between ECI and DDI was created in 1995, and at that time, additional counterclaim defendant Ernest Forman ("Forman") was both ECI's principal and on DDI's Board of Directors.

In late 1998 and early 1999, Forman (acting for ECI) and Peter Levine (another member of DDI's Board [*5] of Directors) negotiated and signed an amendment to the License Agreement (the "1998 Agreement"). The 1998 Agreement provides:

Licensee agrees to pay Licensor a royalty (the "Royalty") of three percent (3%) of the gross revenues derived from any source whatsoever and without exclusion of any kind and in any way associated with the rights licensed under this Agreement, sales of Licensee's products and services associated with software-based decision making, Licensor Software, Expert Choice, or the analytic hierarchy process. This royalty is to be paid monthly based on Licensee's monthly revenue.

1998 Agreement, § 3.1. This arrangement was in effect for several years.

In October 2000, Gartner launched a decision making software product named "Decision Engine." ECI argues that Decision Engine was a direct competitor to the Expert Choice and Decision Drivers software and was the result of a fraudulent misappropriation of ECI's intellectual propery, while Gartner argues it was independently created and supplanted Expert Choice in the marketplace. ECI alleges that Gartner has earned substantial revenues from this and other products, yet has failed to pay royalties to ECI [*6] based on these revenues.

ECI brought this action against Gartner alleging that Gartner is liable to ECI for royalties that use or abuse the plaintiff's intellectual property. ECI alleges, *inter alia*, that under theories of alter ego, oral contract, or promissory estoppel, Gartner is bound by the terms of the 1998 Contract, and therefore, is liable for royalties for all decision making software products and related products

and services it has sold, and that Gartner is liable in tort for similar damages, based on its misappropriation of ECI's software methodology for use in its own products. ECI argues that it should be entitled to pierce the corporate veil to hold Gartner liable for the debt of its subsidiary, DDI.

Gartner has asserted counterclaims against both ECI and Forman, as an additional counterclaim defendant. Gartner seeks a declaration that the 1998 Agreement is null and void, and alleges that ECI and Forman are liable because of Forman's breach of fiduciary duty, that ECI is liable to Gartner for attorney's fees in connection with this action, violation of *Conn. Gen. Stat. § 52-570d* which prohibits the non-consensual recording of phone conversations, [*7] and violation of CUTPA.

## II. STANDARD OF REVIEW

*Rule 26(b)(1) of the Federal Rules of Civil Procedure* defines the scope and limitations of discovery. It states, in relevant part, that "parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." *Fed. R. Civ. P. 26(b)(1)*. The party asserting either attorney-client privilege or work-product protection bears the burden of proving all essential elements of the privilege or protection. *In re Horowitz, 482 F.2d 72, 82 (2d Cir. 1973)*. However, as is the case here, a federal court sitting in diversity must apply state privilege law to determine if waiver of the attorney-client privilege has occurred. *Fed. R. Evid. 501; Sobol v. E.P. Dutton, Inc., 112 F.R.D. 99, 102 (S.D.N.Y. 1986)*. As the defendant points out, Connecticut, the forum state, has adopted the "most significant relationship test" to determine choice of law issues. *Dugan v. Mobile Med. Testing Servs., Inc., 265 Conn. 791, 800-02, 830 A.2d 752 (2003); Interface Flooring Sys., Inc. V. Aetna Cas. & Sur. Co., 261 Conn. 601, 608-09, 804 A.2d 201 (2002)*. [*8] The Court finds that Connecticut has the most significant relationship to the issues raised by the parties because all privileged communications took place in Connecticut, the parties' contractual and business relationship was centered in Connecticut, and DDI's principal place of business is in Connecticut.

## III. DISCUSSION

**A. Waiver of Attorney-Client Privilege with Respect to Documents Produced by Gartner and Subsequently Recalled as Privileged**

The court has conducted an *in camera* review of a discrete set of documents which Gartner originally produced but later recalled on the basis of privilege and inadvertent production. On April 19, 2006, counsel for Gartner produced two disks to plaintiff's counsel. On August 22, 2006, plaintiff's counsel notified Gartner's counsel of the existence of three documents that Gartner had produced which were marked "Attorney-Client-Privileged." On August 24, 2006, the defendant's counsel requested, under the terms of the November 5, 2004 protective order, that plaintiff's counsel return the three documents plus an additional eight documents, and destroy all copies and notes thereof, on the grounds that the documents [*9] were inadvertently produced and are protected from discovery by the attorney-client privilege and/or work product doctrine.

On August 29, 2006, plaintiff's counsel returned all of the disputed documents, along with all copies of the disk on which they were contained. Upon further examination of the disk, defendant's counsel identified three additional documents which, according to defendant's counsel, were inadvertently produced and are privileged. On September 6, 2006, defendant's counsel requested that plaintiff's counsel return the additional protected documents and destroy all copies and notes thereof. Plaintiff's counsel again complied with this request. The plaintiffs then requested an *in camera* review of the aforementioned documents in order to determine whether Gartner waived the attorney client privilege by inadvertent production.

To determine whether an inadvertent disclosure waived the attorney-client privilege, courts in Connecticut and the Second Circuit balance the following factors: (1) the reasonableness of the precautions to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the scope of the discovery and the extent of the inadvertent [*10] disclosure; and (4) overreaching issues of fairness. *Harp v. King, 266 Conn. 747, 768-69, 835 A.2d 953 (2003); Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 104 F.R.D. 103, 105 (S.D.N.Y. 1985)*; accord, e.g., *United States v. United Techs. Corp., 979 F. Supp. 108, 115-16 (D. Conn. 1997)*.

After due consideration of the above-referenced factors, the court finds the factors to weigh heavily in favor of the defendant, and thus the plaintiff's claim of waiver by inadvertent production fails. Daniel Fox, one

of the defendant's attorneys, represents that the defendant produced more than 180,000 pages of documents to the plaintiff in paper form, enough to fill more than 65 banker's boxes, and that he personally reviewed all of the documents for privilege. At the request of plaintiff's previous counsel, defendant's counsel produced two disks containing what defendant's counsel believed were electronic copies of paper documents that had previously been reviewed for privilege and produced. Defendant's counsel used reasonable measures to prevent the inadvertent disclosure of privileged material through its review of over 180,000 pages [*11] of documents, and the handful of documents inadvertently disclosed "pales by comparison" *Deere & Co. v. MTD Prods., No. 00Civ.5936 (LMM)(JCF), 2003 U.S. Dist. LEXIS 13325 at *3 (S.D.N.Y. Aug. 1, 2003)*. Moreover, upon receiving notice by opposing counsel of the existence of potentially privileged documents within the documents already produced, defendant's counsel moved quickly to recover the documents and undertake a further review of the electronic disks in order to determine whether any additional privileged materials had been inadvertently produced.

Finally, the governing protective order expressly states that the inadvertent production of privileged documents shall not constitute a waiver, "provided that the producing party promptly makes a good-faith representation that such production was inadvertent or mistaken and takes prompt remedial action to withdraw the disclosure." (Dkt. # 44 at P17). The defendant has acted in conformity with these requirements. Accordingly, Gartner did not waive the attorney-client privilege with respect to the set of documents which it inadvertently produced and subsequently recalled.

**B. Waiver of Attorney-Client [*12] Privilege based on the Crime-Fraud Exception**

The plaintiffs requested, and were grated, an *in camera* review of the documents withheld by the defendant on the basis of attorney-client privilege, in order to determine whether the privilege as to certain documents should be waived under the crime-fraud exception. Specifically, the plaintiffs argued that certain withheld documents may contain communications which were made with the intent to perpetrate a fraudulent misappropriation of Expert Choice's intellectual property, and that the communications were made in furtherance thereof.

As previously discussed, a federal court sitting in diversity must apply state privilege law to determine if a waiver of the attorney-client privilege has occurred. *Fed. R. Evid. 501; EDO Corp. v. Newark Ins. Co., 145 F.R.D. 18, 21 (D.Conn. 1992)*. The Connecticut Supreme Court has made clear that it has adopted the Second Circuit's extension of the crime-fraud exception to civil fraud. See *Olson v. Accessory Controls & Equipment Corp., 254 Conn. 145, 169, 757 A.2d 14 (2000); Hutchinson v Farm Family Cas. Ins. Co., 273 Conn. 33, 39, 867 A.2d 1 (2005)* [*13] . "The crime-fraud exception permits abrogation of the attorney-client privilege solely upon a determination...that there is probable cause to believe that the privileged communications were made with the intent to perpetrate a civil fraud and that the communications were made in furtherance of that fraud." *Olson 254 Conn. at 174*. The burden of proof with regard to both prongs of the test rests with the party seeking disclosure of the privileged materials. *Hutchinson 273 Conn. at 39*.

After an exhaustive *in camera* review of over two hundred documents, the Court finds that the plaintiff has failed to meet its burden of showing probable cause that the communications at issue were made with the intent to perpetrate a crime or fraud, and that the communications were made in furtherance of that crime or fraud. The Court exercises its discretion to withhold further comment on the content of the privileged documents.

**C. Request for an Order Compelling Production of Documents Evidencing Knowledge or Use by Counsel of the 1998 Agreement**

ECI and Forman have also moved for an order compelling production of any and all documents withheld [*14] as privileged that evidence knowledge by relevant counsel of the 1998 Agreement, on the grounds that the defendant has placed the contract at issue by way of an offensive counterclaim and has therefore waived the attorney-client privilege with respect to those documents. Specifically, Gartner has alleged in its counterclaim that Mr. Forman engaged in a prohibited "interested director transaction" when he executed the 1998 Agreement between Expert Choice and DDI. (Counterclaim P19). At the time, Mr. Forman was both a principal shareholder of Expert Choice and a member of the DDI board of directors. Gartner's counterclaim further alleges that Mr. Forman, acting for Expert Choice, and Mr. Levine, the then-President of DDI, "concealed their negotiations over and their execution of the 1998 Agreement from other

2007 U.S. Dist. LEXIS 21208, *14

members of DDI's board of directors and from the officials at Gartner..[and] counsel for DDI and/or Gartner." (Counterclaim P16). Expert Choice and Forman assert that, by virtue of the factual allegations in the counterclaim, Gartner has waived its right to claim privilege with respect to any documents evidencing knowledge or use by relevant counsel of the 1998 Agreement.

The [*15] Connecticut Supreme Court has opined that the attorney-client privilege "was created to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observation of law and administration of justice...Exceptions to the attorney-client privilege should be made only when the reason for disclosure outweighs the potential chilling of essential communications." *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co.,* 249 Conn. 36, 52, 730 A.2d 51 (1999) (internal citation omitted). Thus, the "at issue" exception to the attorney-client privilege is "invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action . . . [such as] when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some other manner, the attorney-client relationship. *Hutchinson,* 273 Conn. at 39.

The contents of the legal advice rendered by DDI and/or Gartner's counsel is not "integral to the outcome" of Gartner's counterclaim. [*16] *Metro. Life Ins. Co.,* 249 Conn. at 52-53. To the contrary, there are other sufficient ways in which the factual basis for Gartner's counterclaim may be evaluated without the examination of privileged communications. The counterclaim alleges that Mr. Forman and Mr. Levine concealed their negotiations and execution of the 1998 Agreement from other members of DDI's board of directors, officials at Gartner, and counsel for DDI and/or Gartner. (Counterclaim 16). Thus, Mr. Forman himself can testify as to any communications he had with Gartner, DDI, and/or their counsel regarding the 1998 Agreement. Moreover, ECI and Mr. Forman may take full discovery of Mr. Levine to determine what communications he had with agents of DDI and Gartner regarding the agreement, and they may depose every relevant employee at Gartner and DDI to investigate their knowledge of the agreement. In addition, it is Gartner's knowledge, not its counsel's

knowledge, that is relevant to Expert Choice and Forman's affirmative defenses of ratification, estoppel and statute of limitations. As such, the privileged communications are not "actually required for a truthful resolution of the issue." *Id. at 53.* [*17] The plaintiffs' request for an order compelling production of documents evidencing knowledge or use by counsel of the 1998 Agreement is therefore denied.

**D. Documents Erroneously Withheld as Privileged by Gartner which Must Be Produced**

During the course of its *in camera* review of documents withheld by Gartner on the basis of attorney-client privilege and work product, the Court has identified a significant number of e-mails which were improperly withheld. In asserting a claim of privilege, counsel must take care not to withhold unprivileged information. It is not proper to withhold an entire document from discovery on grounds that a portion of it may be privileged. Where a document purportedly contains some privileged information, the unprivileged portions of the document must be produced during discovery. The proper procedure in such instances is to redact the allegedly privileged communication, and produce the redacted document.

Under Connecticut Law, the attorney-client privilege "protects both the confidential giving of advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer [*18] to enable counsel to give sound and informed advice." *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.,* 267 Conn. 279, 329, 838 A.2d 135 (2004). In addition, four criteria must be met in order for the attorney-client privilege to apply to a corporate entity: (1) the attorney must be acting in a professional capacity for the corporation; (2) the communication must be made to the attorney by current employees or officials of the corporation; (3) the communication must relate to the legal advice sought by the corporation from the attorney; and (4) the communication must be made in confidence." *Shew v. Freedom of Information Commission,* 245 Conn. 149, 159, 714 A.2d 664 (2003). The burden of proving each element of the privilege rests with the party asserting it. *State v. Hanna,* 150 Conn. 457, 466, 191 A.2d 124 (1963).

During its *in camera* review, the Court identified certain e-mails which were withheld as privileged apparently under the misguided assumption that all

e-mails to or from an attorney are privileged. "Including an attorney on the distribution list of an interoffice memo, Cc'ing a [sic] numerous people who are ancillary [*19] to the discussion, one of whom happens to be an attorney, or forwarding an e-mail several times until it reaches an attorney does not amount to 'attorney client communication.'" *In re Gabapentin Patent Litig., 214 F.R.D. 178 (2003)*. Therefore, the following e-mails and attached documentation were erroneously withheld by Gartner based on the attorney-client privilege and must be produced to the plaintiffs within ten (10) days hereof:

Document # 30: The e-mails in the chain including, and occurring before, Jamie Popkin's e-mail on December 15, 1999.

Document # 36: The e-mails in the chain including, and occurring before, Ernest Forman's e-mail on January 3, 2000 at 5:09 P.M.

Document # 47: Entire document.

Document # 49: The e-mails in the chain including, and occurring before, Ernest Forman's e-mail on September 10, 2000.

Document # 57: The e-mails in the chain including, and occurring before, Ernest Forman's e-mail on November 30, 2000.

Document # 61: The e-mails in the chain including, and occurring before, Theolyn Prince's e-mail on January 2, 2001.

Document # 69: Entire document.

Document # 87: Entire document.

Document # 89: Entire document.

[*20] Document # 90: E-mail from Kirsten Recknagel and attached Gartner document.

Document # 93: Entire document.

Document # 96: The e-mail from Brenda Webster.

Document # 98: The e-mail from Sharon Catmull.

Document # 99: All e-mails in the chain except for Clive

Taylor's e-mail on May 15, 2003 at 11:43 A.M.

Document # 104: The e-mails in the chain including, and occurring before, Greg Brennan's e-mail on September 25, 2003.

Document # 109: Entire document.

Document # 110: Entire document.

Document # 112: The e-mails in the chain including, and occurring before, Sharon Catmull's e-mail on October 9, 2003.

Document # 114: The e-mail from Linda Brown.

Document # 116: The e-mails in the chain including, and occurring before, Greg Brennan's e-mail on November 5, 2003.

Document # 180: Entire document.

Document # 193: Entire document.

**IV. CONCLUSION**

Based on the foregoing, Plaintiffs ECI and Forman's Motions to Compel **(Dkt. # # 128, 135 and 138)** are **DENIED**. However, defendant Gartner is **ORDERED** to produce the above-referenced improperly withheld documents to the plaintiffs within ten (10) days hereof.

This is not a recommended ruling. [*21] This is a discovery ruling and order reviewable pursuant to the "clearly erroneous" standard of review. *28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 6(a), (e)* and *72(a)*; and Rule 2 of the Local Rules for U.S. Magistrate Judges. As such, it is an order of the court. See *28 U.S.C. § 636(b)*(written objections to ruling must be filed within ten days after service of same).

**IT IS SO ORDERED.**

**Dated at Hartford, Connecticut this 27th day of March, 2007.**

**/s/ Thomas P. Smith**

**UNITED STATES MAGISTRATE JUDGE**



® LexisNexis®

**MORANDE AUTOMOTIVE GROUP, INC., ET AL. v. METROPOLITAN
GROUP, INC., ET AL.**

**Civ. Action No. 3:04 CV 918 (SRU)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*2009 U.S. Dist. LEXIS 19804*

**March 12, 2009, Decided
March 12, 2009, Filed**

**PRIOR HISTORY:** *Morande Auto. Group, Inc. v.
Metro. Group, 2005 U.S. Dist. LEXIS 10341 (D. Conn.,
May 16, 2005)*

**COUNSEL:** [*1] For Morande Automotive Group, Inc.,
Morande Automotive Group Emp Stock Ownership
Trust, Morande Ford, Inc., Plaintiffs: Brooks A. Gill,
LEAD ATTORNEY, Gill Law Firm, PLC, Dumas, AK;
David E. Kamins, LEAD ATTORNEY, E. Hartford, CT.

For Metropolitan Group, Defendant: Moyahoena N.
Ogilvie, LEAD ATTORNEY, McCarter & English,
Cityplace I, Hartford, CT.

For MetLife Inc, Metropolitan Life Ins Co, General Amer
Life Ins Co, Genamerica Financial Corp, Defendants: B.
John Pendleton, Jr., LEAD ATTORNEY, PRO HAC
VICE, McCarter & English-NJ, Newark, NJ; David A.
Reif, James F. DeDonato, William K. Piotrowski, LEAD
ATTORNEYS, McCarter & English-Htfd, Cityplace I,
Hartford, CT; Moyahoena N. Ogilvie, LEAD
ATTORNEY, McCarter & English, Cityplace I, Hartford,
CT; Stephanie J. Cohen, LEAD ATTORNEY, PRO HAC
VICE, McCarter & English-NJ, Newark, NJ.

For Marshall & Stevens Inc, Marshall & Stevens ESOP
Capital Strategies Inc, ThirdParty Defendants: Stan R.
Dombroski, LEAD ATTORNEY, Dombroski, Knapsack
& Hillis, New Haven, CT.

For Reish Luftman Reicher & Cohen, formerly known as,
Reish & Luftman PC, ThirdParty Defendant: John W.
Cannavino, Timothy M. Herring, LEAD ATTORNEYS,
Cummings & Lockwood - Stmfd, Stamford, [*2] CT.

For General Amer Life Ins Co, ThirdParty Plaintiff:
James F. DeDonato, LEAD ATTORNEY, McCarter &
English-Htfd, Cityplace I, Hartford, CT.

For Metropolitan Life Ins Co, General Amer Life Ins Co,
Genamerica Financial Corp, MetLife Inc, ThirdParty
Plaintiffs: David A. Reif, LEAD ATTORNEY, McCarter
& English-Htfd, Cityplace I, Hartford, CT; Moyahoena
N. Ogilvie, LEAD ATTORNEY, McCarter & English,
Cityplace I, Hartford, CT.

For Reish Luftman Reicher & Cohen, ThirdParty
Defendant: John W. Cannavino, Timothy M. Herring,
LEAD ATTORNEY, Cummings & Lockwood - Stmfd,
Stamford, CT.

For Morande Automotive Group, Inc., Morande Ford,
Inc., ThirdParty Defendants: David A. Reif, LEAD
ATTORNEY, McCarter & English-Htfd, Cityplace I,
Hartford, CT.

For Metropolitan Life Ins Co, General Amer Life Ins Co,
Genamerica Financial Corp, MetLife Inc, ThirdParty
Plaintiffs: David A. Reif, William K. Piotrowski, LEAD
ATTORNEYS, McCarter & English-Htfd, Cityplace I,

Hartford, CT; Moyahoena N. Ogilvie, LEAD ATTORNEY, McCarter & English, Cityplace I, Hartford, CT.

For Metropolitan Group, ThirdParty Plaintiff: Moyahoena N. Ogilvie, LEAD ATTORNEY, McCarter & English, Cityplace I, Hartford, CT.

**JUDGES:** Stefan R. Underhill, United [*3] States District Judge.

**OPINION BY:** Stefan R. Underhill

**OPINION**

**RULING ON MOTION TO QUASH**

On September 19, 2008, Morande Automotive Group, Inc., Morande Automotive Group Employee Stock Ownership Trust, and Morande Ford, Inc. (collectively "Morande" or "the plaintiffs") moved to quash the deposition of Carl Andros. Andros, an attorney, provided various services to Morande in connection with the implementation of an employee stock ownership plan ("ESOP"). Defendants Metropolitan Life Insurance Company, Metlife, Inc., MetLife Group, General American Life Insurance Company, and Genamerica Financial Corporation (the "General American defendants") noticed Andros's deposition on August 25, 2008. They argue that Morande has placed its communications with Andros at issue, thereby waiving the attorney-client privilege, because: (1) Morande has raised claims of, *inter alia*, negligent misrepresentation against the defendants; (2) Morande must prove reliance on those alleged misrepresentations to prove its claims; and (3) communications between Andros and Morande are relevant to the question of Morande's reliance on the defendants' representations. Because Morande does not rely on privileged advice from Andros to make [*4] its claim, the plaintiffs' motion to quash **(doc. # 175)** is GRANTED.

**I. Background**

In June 2004, Morande sued the General American defendants, along with Marshall & Stevens Co. a/k/a Marshall & Stevens, Inc. a/k/a Marshall & Stevens ESOP Capital Strategies, Inc. ("Marshall & Stevens") in connection with Morande's attempts to establish and implement an Employee Stock Ownership Plan

("ESOP"). In May 2005, I granted Marshall & Stevens's motion to dismiss. Since that time, General American Life Insurance Company, Genamerica Financial Corporation, and Metlife, Inc. (collectively, "third-party plaintiffs") have filed claims against Marshall & Stevens, Inc., Marshall & Stevens ESOP Capital Strategies, Inc., Roland Attenborough, and Reish Luftman Reicher & Cohen f/k/a Reish & Luftman, PC (collectively, "third-party defendants").

Morande raises claims of negligent misrepresentation, as well as violations of the Connecticut Unfair Trade Practices Act ("CUTPA") and other state statutes, against the General American defendants. The third-party plaintiffs, in their second amended third-party complaint, assert claims for indemnification and contribution from the third-party defendants, alleging negligence [*5] and a common obligation to Morande. A description and summary of the factual allegations underlying the various parties' claims follows.

According to Morande's Fourth Amended Complaint, Morande contracted with the General American defendants for services relating to the implementation of an Employee Stock Ownership Plan ("ESOP"). Although the General American defendants made representations to Morande that requisite manufacturer approval to establish the ESOP was easily obtainable, they were ultimately unable to obtain that necessary approval. Morande also alleges that the General American defendants misrepresented the content and results of a "repurchase liability study" upon which Morande relied when deciding how to structure the proposed ESOP.

Prior to January 1, 2000, Morande Automotive Group, Inc. ("MAG") owned all the stock of three corporations (all automobile dealerships): Morande Ford, Inc.; M & G Imports, Inc.; and Morande Bros., Inc. MAG's owners wanted to form a qualified benefit plan, in the form of an ESOP, to distribute shares of MAG to the employees of the Morande car dealerships.

MAG's owners met with David Dill, a licensed insurance salesperson and agent of General American, [*6] in St. Louis. Dill told the MAG ownership that he could help create an ESOP, and introduced the MAG owners to representatives of Marshall & Stevens, whose representatives Dill represented to be experts in obtaining approval for new car franchise dealership ESOPs from

2009 U.S. Dist. LEXIS 19804, *6

franchisers/manufacturers. Morande, and the third-party plaintiffs, allege that Marshall & Stevens was expert neither in obtaining franchiser/manufacturer approval nor in automobile dealership ESOP implementation.

In Morande's complaint the plaintiffs assert that, relying on representations of Marshall & Stevens's expertise, MAG contracted with Marshall & Stevens for services associated with the "implementation of an Employee Stock Ownership Plan." [1] However, Marshall & Stevens did not obtain the required franchiser/manufacturer approval.

> 1    Morande Ford, Inc. -- not MAG -- was the entity named on the contract with Marshall & Stevens. Because Morande Ford was named as the contracting party, it is named as a plaintiff in this suit.

Eventually Morande, along with another General American client in a similar position, cancelled insurance policies purchased from Dill in conjunction with the ESOPs, and claimed economic damages suffered [*7] as a result of General American's alleged negligent misrepresentations. In federal district court in Arkansas, Dill sued General American for corresponding lost commissions (and punitive damages), asserting a negligent misrepresentation claim against General American. He prevailed.

Morande's pending motion to quash concerns the deposition of Carl Andros, which was noticed by the General American defendants. Morande retained Andros as part of his attempts to create and implement an ESOP. The record indicates that Andros worked with banks and other entities to effectuate the ESOP and also that he counseled Morande regarding the ESOP-creation process. The General American defendants have asserted that they noticed Andros's deposition in search of evidence in support of their argument that, in light of advice and information Andros communicated to Morande, Morande could not have reasonably relied on the General American defendants' alleged misrepresentations. Morande moves to quash the Andros deposition, arguing that communications between Andros and Morande are protected by the attorney-client privilege.

## II. Discussion

"The attorney-client privilege is one of the oldest recognized privileges [*8] for confidential communications." *Swidler & Berlin v. United States, 524 U.S. 399, 403, 118 S. Ct. 2081, 141 L. Ed. 2d 379 (1998)*. The privilege exists to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)*. "[S]ound legal advice or advocacy serves public ends and . . . such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.; see also Trammel v. United States, 445 U.S. 40, 51, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980)* ("The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."); *Fisher v. United States, 425 U.S. 391, 403, 96 S. Ct. 1569, 48 L. Ed. 2d 39 (1976)* (recognizing that the purpose of the privilege is "to encourage clients to make full disclosure to their attorneys."). Because the attorney-client privilege plays such a critical role in the administration of justice, "rules which result in the waiver of this privilege and thus possess the potential to weaken attorney-client trust, should be formulated with caution." *In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008)*.

As [*9] a general matter, "[c]ourts have found waiver by implication when a client testifies concerning portions of the attorney-client communication, . . . when a client places the attorney-client relationship directly at issue, . . . and when a client asserts reliance on an attorney's advice as an element of a claim or defense. . . ." *Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)*. For instance, a client's reliance on an attorney's advice as an element of a claim or defense, such as the assertion of a good faith defense to fraud or negligent misrepresentation charges, places otherwise privileged attorney-client communications at issue and implicitly waives the privilege. Because a fact finder would be unable to evaluate the merits of the good faith defense without evidence of what legal advice the defendant relied on -- a jury *could not* evaluate the defense *without* the protected information -- the privilege must give way. When that individual asserts his good faith defense, he squarely places at issue otherwise protected legal advice, and affirmatively waives the attorney-client privilege.

Here, the General American defendants argue that, by virtue of the plaintiffs' negligent [*10] misrepresentation claims, Morande has placed at issue the

communications between Morande and Andros and has, accordingly, implicitly waived the protections of the attorney-client privilege. Under Connecticut law, Morande must prove reasonable reliance on the General American defendants' alleged misrepresentations to prove its claims. *See, e.g., Nazami v. Patrons Mut. Ins. Co., 280 Conn. 619, 626, 910 A.2d 209 (2006)* ("an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result"). Information and advice that Andros communicated to Morande is relevant to the question of whether Morande's reliance on General American's alleged misrepresentations was reasonable. In other words, if Andros warned Morande that manufacturer approval of the proposed ESOP would be difficult or impossible to obtain, despite the General American defendants' representations to the contrary, a jury could find that Morande's reliance on those representations was *unreasonable* in light [*11] of Andros's warnings. The question that Morande's motion to quash raises, then, is whether Morande's negligent misrepresentation claims implicitly waive the attorney-client privilege with regard to communications between Andros and Morande because those communications are relevant to the claims.

Until the Second Circuit recently addressed the scope of the "at issue," or "implied," waiver of the attorney-client privilege in *Erie*, the contours of that waiver were unclear. Prior to *Erie*, the Court of Appeals had primarily cited *Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975)*, which imposed a three-pronged test to determine whether a party implicitly waived the attorney-client privilege because he placed otherwise privileged communications at issue. A court applying the *Hearn* test would find implicit waiver when "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *Hearn, 68 F.R.D. at 581.* [*12] *See, e.g., In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000)* (citing *Hearn*); *United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)* (citing *Hearn*).

Applied broadly, *Hearn* implicates waiver of

attorney-client privilege any time that privileged communications are relevant to a claim at issue. "*Hearn* is problematic insofar as there are very few instances in which the *Hearn* factors, taken at face value, do not apply and, therefore, a large majority of claims of privilege would be subject to waiver." *Pereira v. United Jersey Bank, 1997 U.S. Dist. LEXIS 19751, 1997 WL 773716, at *3 (S.D.N.Y. Dec. 11, 1997).* Accordingly, in *Erie*, the Second Circuit recognized that "[c]ourts in our Circuit and others have criticized *Hearn* and have applied its tests unevenly" and clarified "the scope of the at-issue waiver and the circumstances under which it should be applied." *Erie, 546 F.3d at 227-28.*

The *Erie* decision states that: "According to *Hearn*, an assertion of privilege by one who pleads a claim or affirmative defense 'puts the protected information at issue by making it relevant to the case.' But privileged information may be in some sense *relevant* in any lawsuit . . . . We hold that a party must *rely* on [*13] privileged advice from his counsel to make his claim or defense." *Id. at 229* (internal citation omitted). This reasoning is consistent with the reasons, discussed above, that the attorney-client privilege should only be found waived in narrow circumstances, as well as with past Second Circuit decisions applying *Hearn*.

In *In re Grand Jury Proceedings, 219 F.3d at 179*, the Court of Appeals considered whether statements made by a corporate officer and by in-house counsel to a grand jury waived the corporation's privileges because they disclosed privileged communications for exculpatory purposes; in *Bilzerian, 926 F.2d at 1291*, the defendant moved in limine for a ruling permitting him to testify regarding his belief in the lawfulness of certain conduct without being subjected to cross-examination on communications he had with his attorney on that subject. Both cases concerned parties seeking to use the attorney-client privilege as both a sword and a shield, affirmatively relying on privileged information to support a defense while otherwise keeping private attorney-client communications that might have been damaging. Those cases likewise recognize that the parties seeking the protections [*14] of the privilege place privileged information squarely at issue, holding that "a party cannot . . . *affirmatively rely* on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party," *In re Grand Jury Proceedings, 219 F.3d at 182* (emphasis added), and that "the privilege may be

2009 U.S. Dist. LEXIS 19804, *14

implicitly waived when defendant *asserts a claim* that in fairness *requires* examination of protected communications." *Bilzerian, 926 F.2d at 1292* (emphasis added).

The Connecticut Supreme Court has adopted similar language, writing in *Metropolitan Life Ins. Co. v. Aetna Cas. and Sur. Co., 249 Conn. 36, 52-53, 730 A.2d 51 (1999)*, that:

> Because of the important public policy considerations that necessitated the creation of the attorney-client privilege, the "at issue," or implied waiver, exception is invoked only when the contents of the legal advice is *integral* to the outcome of the legal claims of the action. Such is the case when a party specifically pleads reliance on an attorney's advice *as an element of a claim or defense*, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in some [*15] other manner, the attorney-client relationship. In those instances the party has waived the right to confidentiality by placing the content of the attorney's advice directly at issue because the issue *cannot be determined* without an examination of that advice. If the information is actually *required* for a truthful resolution of the issue . . . which the party has raised . . . the party must either waive the attorney-client privilege as to that information or it should be prevented from using the privileged information to establish the elements of the case.

(Emphasis added) (internal footnotes, citation and quotation marks omitted). Here, Morande's negligent misrepresentation claims do not depend on Morande's reliance on privileged advice from Andros. Morande must prove reliance on the defendants' alleged misrepresentations. Although privileged communications between Andros and Morande are relevant to the negligent misrepresentation question, Morande's reliance

on Andros's counsel is not a question upon which the negligent misrepresentation claims depend. "There must be 'some showing by the party arguing for a waiver that the opposing party *relies* on the privileged communication as a [*16] claim or defense or as an element of a claim or defense.'" *Weiss v. National Westiminister Bank, PLC, 2008 U.S. Dist. LEXIS 99443, 2008 WL 5115027, at *2 (E.D.N.Y. Dec. 3, 2008)* (quoting *Erie, 546 F.2d at 228*).

Although it would be helpful for the General American defendants to know what advice Andros gave Morande, because it would be relevant to whether Morande reasonably relied on the General American defendants' representations, Morande has not placed that advice at issue. When the plaintiffs asserted negligent misrepresentation claims against the General American defendants, they raised the question of Morande's reliance on the General American defendants, *not* the question of Morande's reliance on Andros's advice. Knowing Andros's advice would ostensibly make the General American defendants' defense case an easier one, but that advice is neither integral to nor necessary for the resolution of Morande's negligent misrepresentation claims.

### III. Conclusion

Morande's negligent misrepresentation claims do not rely on communications between Andros and Morande. Accordingly, Morande has not implicitly waived the attorney-client privilege by placing those communications at issue. Because a fact finder can consider Morande's [*17] claims without the privileged communications, Morande's motion to quash (**doc. # 175**) is GRANTED. Nothing in this ruling should be construed as limiting discovery from Andros of documents or information not protected by the attorney-client privilege.

It is so ordered.

Dated at Bridgeport this 12th day of March 2009.

/s/ Stefan R. Underhill

Stefan R. Underhill

United States District Judge